USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 95-1199 UNITED STATES, Appellee, v. TRENT MANNING, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________ ____________________ Before Selya, Cyr and Stahl, Circuit Judges. ______________ ____________________ Robert B. Mann with whom Mann & Mitchell was on brief for ________________ _________________ appellant. Sheldon Whitehouse, United States Attorney, with whom Assistant ___________________ United States Attorneys were on brief for appellee. ____________________ March 21, 1996 ____________________ STAHL, Circuit Judge. On May 6, 1994, this court STAHL, Circuit Judge. _____________ vacated defendant-appellant Trent Manning's convictions for possession with intent to distribute cocaine (Count I), use of a firearm during and in relation to a drug trafficking crime (Count II), and possession of a firearm by a convicted felon (Count III), holding that prosecutorial misconduct during closing arguments warranted a new trial. United ______ States v. Manning, 23 F.3d 570, 573-76 (1st Cir. 1994). ______ _______ After his second jury trial in November of 1994, Manning again was convicted on all three counts. Manning challenges this latest round of convictions, claiming that the district court erred in: (1) denying his motion for acquittal on Count II, (2) admitting evidence of uncharged misconduct, (3) denying his request for an expert, (4) precluding evidence and argument regarding his potential sentence, (5) denying his motion to suppress evidence found during the October 7, 1991 search, (6) instructing the jury, and (7) responding to the jury's inquiry. Finding no merit in Manning's first six claims, we affirm his convictions on Counts I and III. Finding that the district court erred in responding to the jury's inquiry, however, we vacate Manning's conviction on Count II and remand Count II for a new trial. I. I. __ BACKGROUND BACKGROUND __________ -2- 2 Viewing the evidence in the light most favorable to the verdict, United States v. Wihbey, No. 95-1291, slip op. ______________ ______ at 2 (1st Cir. Feb. 6, 1996), we conclude that a reasonable jury could have found the following facts. Late in the afternoon on October 7, 1991, several members of the Providence Police Department executed a search warrant at Manning's mother's house, located at 151 Doyle Avenue in Providence, Rhode Island. Just three or four minutes before the raid, Detective David Lussier, who had known Manning for some time, saw Manning and a passenger drive by his surveillance position (in a parking lot about fifty yards from 151 Doyle Avenue with a direct view into its rear yard) in Manning's red Jeep Cherokee. Fearing that eye contact with Manning had compromised his surveillance, Lussier ordered that the warrant be executed. Thereupon, Detective Joseph Lennon approached the rear of 151 Doyle Avenue and saw Manning, whom he knew and with whom he had conversed on other occasions, standing outside the Cherokee and in front of the garage, holding a brown briefcase in his left hand. Lennon identified himself as a police officer and, with gun drawn, ordered Manning to stop. Manning, ignoring this directive, walked slowly into the garage with briefcase in hand, closing and locking the door behind him. Manning's rottweiler, loose in the driveway, delayed Lennon's pursuit of Manning for three to -3- 3 five minutes. Once inside the garage, Lennon found and seized the briefcase and its contents, inter alia: two bags _____ ____ of cocaine weighing 124.64 grams, various drug paraphernalia, a loaded 9 millimeter handgun, and six copper pipe bombs. Lennon did not, however, find Manning in his subsequent search of the house. Meanwhile, Lussier, having ordered the raid, drove to the front of 151 Doyle Avenue, entered the front door, and proceeded to the basement, where he found a broken window through which Manning had likely escaped. One week later, Manning turned himself in to the police.  II. II. ___ DISCUSSION DISCUSSION __________ A. Motion for Acquittal ________________________ Manning argues that there was insufficient evidence to support his conviction for using a destructive device1 during and in relation to a drug trafficking crime, and so the district court erred in denying his motion for acquittal on Count II. We review the district court's disposition of a motion for acquittal de novo, viewing the evidence, and all __ ____ reasonable inferences that may be drawn therefrom, in the  ____________________ 1. 18 U.S.C. 921(a)(3) defines "firearm" to mean "any destructive device." Section 921(a)(4) defines "destructive device" to mean "any explosive, incendiary, or poison gas . . . bomb."  -4- 4 light most favorable to the government. United States v. _____________ Loder, 23 F.3d 586, 589-90 (1st Cir. 1994). _____ Approximately one month after oral arguments in this case, the Supreme Court decided Bailey v. United States, ______ _____________ 116 S. Ct. 501 (1995), and concluded that "use" of a firearm in 18 U.S.C. 924(c)(1) means "active employment of the firearm" which "includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. at 505, 508. Our careful review of ___ the record reveals that the government's evidence was insufficient to show "use" under the Bailey standard. The ______ government did not present any evidence that Manning had brandished, displayed, bartered, struck someone with, fired/detonated or attempted to fire/detonate either the 9 millimeter handgun or the six pipe bombs. The evidence presented at trial was simply that Manning had carried the briefcase containing the gun, pipe bombs, drugs, and drug paraphernalia into the garage of 151 Doyle Avenue and nothing more. The reach of 18 U.S.C. 924(c)(1), however, extends beyond the use of a firearm. Section 924(c)(1) applies to any person who either "uses or carries a firearm." __________ 18 U.S.C. 924(c)(1) (emphasis added). At issue, therefore, is whether the government succeeded in presenting evidence sufficient to show that Manning was guilty of carrying a ________ -5- 5 firearm during and in relation to any drug trafficking crime. Conviction under 924(c)(1) requires proof beyond a reasonable doubt that Manning: (1) committed the drug trafficking crime of possession with intent to distribute as charged in the indictment, (2) knowingly carried a firearm, and (3) did so during and in relation to the drug trafficking crime. See United States v. Wilkinson, 926 F.2d 22, 25-26 ___ _____________ _________ (1st Cir.), cert. denied, 501 U.S. 1211 (1991), and overruled _____ ______ ___ _________ on other grounds by Bailey, 116 S. Ct. at 509. Because __ _____ _______ __ ______ Manning has not challenged the sufficiency of the evidence of the first element, we restrict our analysis to the last two elements and consider each in turn. By narrowing the interpretation of "use" to instances of active employment, the Bailey Court recognized ______ that the "carry" prong would take on a new significance. Accordingly, the Court remanded Bailey and its companion ______ case, Robinson v. United States, No. 94-7492, to the District ________ _____________ of Columbia Circuit to consider liability for Bailey and Robinson under the "carry" prong of 924(c)(1). Bailey, 116 ______ S. Ct. at 509. In Bailey and Robinson, the firearms were ______ ________ found in the trunk of a car and in a locked trunk in a bedroom closet, respectively. Id. at 503-04. Determining ___ whether firearms found in these locations were carried will require the District of Columbia Circuit to test the limits of the proper understanding of "carry" in 924(c)(1). We -6- 6 need not determine the precise contours of the "carry" prong here, however, as Manning's actions meet any reasonable construction of the word. See Smith v. United States, 113 S. ___ _____ _____________ Ct. 2050, 2054 (1993) (noting that words not defined by statute should be given their ordinary or common meaning). The word "carry" is variously defined as "to move while supporting (as . . . in one's hands or arms)," "to move an appreciable distance without dragging," and "to bring along to another place." Webster's Third New International __________________________________ Dictionary 343 (1986). Manning's alleged actions readily __________ meet all of these definitions. The government presented the testimony of Detective Lennon that he saw Manning standing outside his Cherokee and in front of the garage of 151 Doyle Avenue, holding the briefcase; that he watched Manning, while holding the briefcase in his left hand, walk into the garage; and that minutes later upon discovering the briefcase in the garage, he opened it and found, inter alia, a loaded 9 _____ ____ millimeter handgun and six pipe bombs. A reasonable juror could easily conclude from this evidence that Manning had carried the handgun and pipe bombs. In walking from the Cherokee to the garage while holding the briefcase in his left hand, Manning certainly was "moving" the briefcase "while supporting" it in his hand. And if Manning was carrying the briefcase, he necessarily was carrying the contents thereof, namely, the handgun and pipe bombs. -7- 7 The government also presented ample evidence from which a reasonable juror could conclude that Manning carried the gun and bombs "during" and "in relation to" the crime of possession with intent to distribute. Evidence that Manning carried the gun and pipe bombs contemporaneously with the two bags of cocaine and the drug paraphernalia readily satisfies the "during" requirement. See United States v. Luciano- ___ ______________ ________ Mosquera, 63 F.3d 1142, 1151 (1st Cir. 1995) (holding that ________ gun "carried at a time when the offense was in progress" constituted "during" for purposes of 924(c)(1)). Evidence that Manning carried the gun and bombs in the same briefcase as the drugs readily satisfies the "in relation to" requirement. Because the government presented evidence that could establish each of these elements beyond a reasonable doubt, we affirm the district court's denial of Manning's motion for acquittal on Count II.  B. Admissibility of Evidence of Uncharged Misconduct _____________________________________________________ Manning argues that the district court erred by allowing the prosecutor to cross-examine him about his prior drug dealing and to introduce the items seized from the basement of 151 Doyle Avenue. Manning's attorney objected to the introduction of this evidence as impermissible "uncharged misconduct" evidence under Fed. R. Evid. 404(b) and, in the alternative, unduly prejudicial under Fed. R. Evid. 403. After reciting the standard of review, we consider Manning's -8- 8 testimony on cross-examination and the items seized from the basement, in turn.  Because the admission of Rule 404(b) evidence is committed to the sound discretion of the trial judge, we will reverse on appeal only for abuse of discretion. United ______ States v. Garcia, 983 F.2d 1160, 1172 (1st Cir. 1993). We ______ ______ will reverse a district court's Rule 403 balancing "only in 'exceptional circumstances.'" Id. at 1173 (quoting United ___ ______ States v. Garcia-Rosa, 876 F.2d 209, 221 (1st Cir. 1989), ______ ___________ cert. denied, 493 U.S. 1030 (1990)). _____ ______ On cross-examination, the prosecutor successfully elicited testimony from Manning about his drug dealing efforts prior to October 7, 1991. In particular, Manning testified that he had previously sold cocaine; that he would package the cocaine in a specific type of plastic bag; that he weighed drugs on two particular scales; and that, as denoted by his handwriting in his drug ledger, he would distribute 100 bags of cocaine every two days to a particular location. The prosecutor also questioned Manning about his use of a pager and the source of his drug supply. All of this was done over the objection of Manning's attorney.  Rule 404(b) provides that although evidence of other crimes, wrongs, and acts is not admissible to prove criminal propensity, it may be admissible for other purposes that do not involve character, such as proof of intent, -9- 9 preparation, knowledge or absence of mistake. Garcia, 983 ______ F.2d at 1172. Moreover, when charges of drug trafficking are involved, this court has often upheld the admission of evidence of prior narcotics involvement to prove knowledge and intent. See United States v. Hadfield, 918 F.2d 987, 994 ___ _____________ ________ (1st Cir. 1990) (collecting cases), cert. denied, 500 U.S. _____ ______ 936 (1991). Manning was charged in Count II with knowingly possessing the two bags of cocaine in the briefcase with the intent to distribute them. Manning's statements regarding his prior drug dealing are highly probative of the knowledge and intent elements of that offense. The evidence that Manning had previously sold cocaine makes it more likely both that he was aware of the contents of the plastic bags in the briefcase and that he intended to distribute the two bags of cocaine. Having determined that Manning's statements were probative, we must consider whether their probative value was substantially outweighed by their prejudicial effect. Fed. R. Evid. 403. The district court minimized any prejudicial impact of the prior drug dealing evidence by instructing the jury, contemporaneously and again in its final instructions, about the proper use of prior bad act evidence. See United ___ ______ States v. Powell, 50 F.3d 94, 101 (1st Cir. 1995) (finding ______ ______ that limiting instruction insulated against prejudicial impact); see also, Richardson v. Marsh, 481 U.S. 200, 206 _________ __________ _____ -10- 10 (1987) (holding that reviewing court typically presumes jury followed instructions). Given the district court's limiting instructions and its broad discretionary power to balance probative value against prejudicial effects, we cannot say that the district court abused its discretion in admitting the evidence of Manning's prior drug dealing. Manning also challenges the district court's admission of items such as scales, bags, glassine packets stamped "Super Power" and "Hot Pursuit," rubber bands, and straws, seized from the basement and garage of 151 Doyle Avenue. Manning's assertion, however, that the items seized are governed by Rule 404(b) is wide of the mark. Rule 404(b), by its very terms, excludes only extrinsic evidence-- "evidence of other crimes, wrongs, or acts"--whose probative value exclusively depends upon a forbidden inference of criminal propensity. Hadfield, 918 F.2d at 994. Evidence ________ intrinsic to the crime for which the defendant is on trial, accordingly, is not governed by Rule 404(b). United States ______________ v. Tutiven, 40 F.3d 1, 5 (1st Cir. 1994) ("The cases are _______ legion in which similar intrinsic circumstantial evidence has been admitted without occasioning either challenge or analysis under Rule 404(b)."), cert. denied, 115 S. Ct. 1391 _____ ______ (1995).  The items seized from 151 Doyle Avenue most certainly qualify as intrinsic to the crime of possession -11- 11 with intent to distribute with which Manning was charged. During the search on October 7, 1991, each of the items were found in the basement of 151 Doyle Avenue, save one scale discovered in the garage. Should a juror have chosen to believe that Manning occupied the basement bedroom of 151 Doyle Avenue,2 the existence of the drug paraphernalia there is directly probative of both Manning's knowledge that the bags in the briefcase contained cocaine and his intention to distribute that cocaine. See United States v. Nason, 9 F.3d ___ _____________ _____ 155, 162 (1st Cir. 1993) (upholding admission of scales, bags, and baggies seized from motel room registered to defendant's girlfriend at time of defendant's arrest on the marijuana charges for which he was on trial), cert. denied, _____ ______ 114 S. Ct. 1331 (1994). The district court did not abuse its discretion in admitting the drug-paraphernalia evidence. C. Request for an Expert _________________________ Manning also complains that the district court erred in denying his request for appointment of an expert. The Criminal Justice Act, 18 U.S.C. 3006A(e)(1), provides that "a person who is financially unable to obtain . . . expert . . . services necessary for an adequate defense" may obtain them after demonstrating in an ex parte hearing that __ _____  ____________________ 2. The government presented evidence from which the jurors could draw such a conclusion. For instance, the government introduced pager and veterinary bills addressed to Trent Manning, 151 Doyle Avenue and police testimony that these bills were found in the basement bedroom area.  -12- 12 such services are "necessary." A district court's denial of a request for such services is reviewed only for an abuse of discretion. United States v. Mateos-Sanchez, 864 F.2d 232, _____________ ______________ 240 (1st Cir. 1988); United States v. Fosher, 590 F.2d 381, _____________ ______ 384 (1st Cir. 1979). At the hearing on this issue, Manning's attorney requested the expert services of a retired Providence police officer who purportedly would have testified about the inadequacies in the Providence Police Department's investigation of Manning's case. In particular, the expert would have highlighted the police's failure to test the broken glass of the basement window for fingerprints and to trace the origins of the pipe bomb components.  Generally, expert services have been found necessary when the proffered expert testimony was pivotal to the indigent defendant's defense. See Mateos-Sanchez, 864 ___ ______________ F.2d at 239-40. For instance, courts have appointed a fingerprint expert when a fingerprint, alleged to be the defendant's, was the primary means of connecting the defendant to the crime, see United States v. Durant, 545 F.2d ___ _____________ ______ 823, 827 (2d Cir. 1976), and a psychiatrist when the defendant's sanity at the time of the offense was at issue, see United States v. Williams, 998 F.2d 258, 264 (5th Cir. ___ _____________ ________ 1993), cert. denied, 114 S. Ct. 940 (1994). Manning's _____ ______ proffered expert testimony on the adequacy of the police -13- 13 investigation, however, was not critical or necessary to his defense.  Manning was charged with using or carrying destructive devices during and in relation to a drug trafficking crime. Whether Manning had manufactured the bombs was not at issue. The proffered testimony that the police failed to trace the bomb components, therefore, cannot be said to be central to Manning's defense of Count II. Given the eyewitness testimony of Manning carrying the briefcase and all the physical evidence found in the basement and garage, including a scale with Manning's fingerprint on it, the expert testimony on the police's failure to fingerprint the broken glass from the basement window is likewise peripheral to Manning's defense of Count II.3  Moreover, as the district court noted, Manning's proffered expert testimony about whether or not a particular police act or omission was good police practice had the potential of confusing the jury and diverting its attention from its task of assessing the adequacy of the prosecution's evidence on the issue of guilt. Upon these facts, we cannot say that the district court's denial of Manning's request for  ____________________ 3. We also note that Manning's attorney was able to place these alleged investigative shortcomings before the jury on cross-examination of the officers. -14- 14 appointment of the proffered expert was an abuse of its discretion.4  D. Jury Nullification ______________________ At two points during trial, Manning's attorney attempted to alert the jury to the potential term of imprisonment Manning would face if convicted on Count II.5 During Manning's direct examination, Manning's attorney requested the court's permission to ask Manning whether, in October of 1991, he was aware of the substantial prison term facing someone found using or carrying a destructive device during and in relation to a drug trafficking crime. The district court denied the request as irrelevant, noting that sentencing matters are entrusted to the judge, not the jury. At the close of all the evidence, Manning's attorney again approached the court at sidebar, this time seeking permission to appeal, in his closing argument, to the jury's power of nullification by informing the jury of the prison term Manning would face if convicted of Count II. The district court also denied this request, invoking the rationale it had used earlier.   ____________________ 4. This is not to say, however, that expert opinion on the adequacy of a police investigation can never be necessary to an indigent defendant's defense nor do we so rule. 5. Under 924(c)(1), using or carrying a destructive device carries a mandatory thirty-year prison term. -15- 15 Because we reverse Manning's conviction on Count II for jury coercion, see part II.G. infra, we need not reach ___ _____ this issue. We nonetheless offer the following cursory analysis of the second argument as guidance. We have consistently held that a district court may not instruct the jury as to its power to nullify. See United States v. ___ ______________ Sepulveda, 15 F.3d 1161, 1190 (1st Cir. 1993), cert. denied, _________ _____ ______ 114 S. Ct. 2714 (1994); United States v. DesMarais, 938 F.2d _____________ _________ 347, 350 (1st Cir. 1991); Garcia-Rosa, 876 F.2d at 226; ___________ United States v. Boardman, 419 F.2d 110, 116 (1st Cir. 1969), _____________ ________ cert. denied, 397 U.S. 991 (1970). An attorney's attempt to _____ ______ achieve the same end indirectly, by arguing the severity of the punishment to the jury, is equally impermissible. See ___ United States v. Calhoun, 49 F.3d 231, 236 n.6 (6th Cir. ______________ _______ 1995) (holding that a defendant did not have the right to inform the jury of possible punishment or of its power to nullify a law or sentence); cf. United States v. Coast of ___ _____________ _________ Maine Lobster Co., 538 F.2d 899, 903-04 (1st Cir. 1976) __________________ (holding that prosecutor's televised comment that white collar criminal sentences are too small, communicated to jurors of ongoing white collar criminal trial, created reversible error). E. Motion to Suppress ______________________ Before his first trial, Manning moved to suppress the evidence found during the October 7, 1991 search of 151 -16- 16 Doyle Avenue. After a hearing, the district court denied the motion. Manning later objected to the evidence as it was offered at trial and then raised the objection on appeal. We did not address the suppression issue, however, having ordered a retrial on other grounds. On appeal from his second trial, Manning again asks us to consider the legality of the search. This time, Manning had neither renewed his suppression motion nor registered his objection to the admission of the evidence below. While Manning maintains that this was unnecessary because the decisions of the first trial judge are the law of the case, the government contends that his suppression arguments are waived. We need not enter this thicket, however, because assuming arguendo that ________ Manning's arguments are preserved, we find that they still fail. Manning attacks the district court's denial of his suppression motion on two grounds. First, Manning contends that the affidavit supporting the search warrant does not establish probable cause, citing the staleness of the information regarding the confidential informant's controlled buy, the dearth of information about that informant's credibility, and a general lack of detail. Second, Manning contests the district court's refusal to conduct an in camera __ ______ proceeding to test the reliability of the confidential informant ("CI") regarding the controlled buy. Manning -17- 17 argues that an in camera review was necessary to his mounting __ ______ a Franks challenge6 to the accuracy of the officer's ______ statements in the affidavit supporting the search warrant. After summarizing the affidavit, we consider Manning's second claim first. On October 7, 1991, to support his application for a warrant to search 151 Doyle Avenue, Detective Lussier attested to the following facts. "During the past few weeks," while Lussier was investigating marijuana trafficking at 151 Doyle Avenue, Manning had used keys to enter 151 Doyle Avenue and appeared to be living there. While Manning was home, several people had come to the rear door of the house and stayed for only a short time. Lussier took numerous phone complaints about narcotics trafficking at 151 Doyle Avenue. A CI, who had bought marijuana from Manning previously, made a controlled buy from Manning at 151 Doyle Avenue. Before the buy, Lussier searched the CI for money and contraband, gave the CI money, and witnessed the CI enter the rear of the house.  ____________________ 6. Under Franks v. Delaware, 438 U.S. 154, 155-56 (1978), a ______ ________ defendant may overcome the presumption of validity surrounding affidavits supporting search warrants and obtain an evidentiary hearing, if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  -18- 18 We recognize that when an affidavit relies primarily on information provided by a CI, a defendant will lack the information needed to make a Franks showing. See ______ ___ United States v. Higgins, 995 F.2d 1, 3 (1st Cir. 1993). In _____________ _______ such cases, where the defendant challenges the accuracy of the affidavit but has failed to make the "substantial preliminary showing" required by Franks, the court may ______ ___ conduct an in camera interview of the officer-affiant, and, __ ______ if necessary, of the informant. See United States v. ___ ______________ Southard, 700 F.2d 1, 10-11 (1st Cir.), cert. denied, 464 ________ _____ ______ U.S. 823 (1983). A district court is not required to do so, however; the decision whether an in camera proceeding is __ ______ needed to test the officer-affiant's7 credibility rests entirely with the district court. See United States v. ___ _____________ Jackson, 918 F.2d 236, 241 (1st Cir. 1990). We review a _______ district court's denial of a defendant's request for an in __ camera proceeding for abuse of discretion. See United States ______ ___ _____________ v. Valerio, 48 F.3d 58, 62-63 (1st Cir. 1995); Higgins, 995 _______ _______ F.2d at 3. Manning argues that he presented evidence at the suppression hearing sufficient to contradict Lussier's statements in the affidavit and thereby require the district court to question his credibility. Specifically, Manning's  ____________________ 7. Franks only allows impeachment "of the affiant, not of ______ any nongovernmental informant." Franks, 438 U.S. at 171. ______ -19- 19 mother testified that she was home all day on October 7, 1991 and that no sale of drugs could have taken place in her home without her knowledge. Manning's attorney told the district court that, although the affidavit does not specify the date of the controlled buy, he recalled that a police officer, not Lussier, had testified at the preliminary examination that the buy took place on October 7, 1991. Manning concludes from these two facts that the controlled buy could not have taken place on October 7, 1991, and therefore, that Lussier must have lied.  As the district court recognized, however, two problems inhere in this reasoning. First, the affidavit does not provide that the controlled buy occurred on October 7, 1991.8 Second, even if it did, Mrs. Manning's testimony does not "preclude at all the possibility that Officer . . . Lussier is telling the truth." Mrs. Manning admitted that Manning was at 151 Doyle Avenue for at least some period of time on October 7, 1991, and she did not claim that he was never out of her sight. Given the tenuous basis for Manning's challenge to Lussier's veracity, the district court's denial of Manning's request for an in camera review __ ______ was well within its discretion.  ____________________ 8. We find no clear error in the district court's not accepting Manning's attorney's recollection that an unnamed police officer, not present during the controlled buy, testified at the preliminary examination that the buy occurred on October 7, 1991. -20- 20 Having so decided, we quickly dispose of Manning's challenge to the validity of the search warrant for lack of probable cause. Assuming arguendo that Manning is correct ________ about the warrant's invalidity, we nonetheless agree with the district court's conclusion that the "good faith" exception to the exclusionary rule applies here. United States v. ______________ Leon, 468 U.S. 897, 913 (1984). In Leon, the Supreme Court ____ ____ held that, with limited exception, the exclusionary rule should not apply when police officers reasonably rely on a warrant that subsequently is determined to be invalid. 468 U.S. at 922. Upon de novo review, see United States v. __ ____ ___ _____________ Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (reviewing district ______ court's "ultimate constitutional conclusions" in a suppression order de novo), we find that Lussier's affidavit __ ____ had ample indicia of probable cause "'to render official belief in its existence'" reasonable. Leon, 468 U.S. at 923 ____ (quoting Brown v. Illinois, 422 U.S. 590, 610-11 (1975) _____ ________ (Powell, J., concurring in part)). Accordingly, we affirm the district court's denial of the motion to suppress the items seized from 151 Doyle Avenue.  F. Jury Instructions _____________________ Manning raises two challenges to the jury instruction defining the offense of using or carrying a firearm during and in relation to a drug trafficking crime. First, he argues that the district court failed to instruct -21- 21 the jury that the destructive devices must have actually been used. Second, he claims that the court failed to instruct that the destructive devices must have facilitated the charged crime of possession with intent to distribute, and not some other past or future drug trafficking crime.  Our reversal of Manning's conviction on Count II for jury coercion, see part II.G. infra, however, renders ___ _____ consideration of the legality of the court's 924(c)(1) instruction unnecessary.9 G. Responses to Jury's Inquiry _______________________________ Manning contests the district court's responses to a specific jury query on two grounds: (1) that the district court's response was tantamount to a directive that the jury must reach a verdict on Count II, and (2) that the district court did not cure this harm by polling the jurors -- after they had reached a verdict but before the verdict was taken - - on whether they had felt compelled to reach a verdict. Mindful of the district court's broad discretion in "the  ____________________ 9. Although its 924(c)(1) instruction initially made clear that the predicate drug trafficking crime was possession of cocaine with intent to distribute it as charged in Count I, in later instructions, the district court stated that "there must be proof that the firearm was connected to or played a role in the commission of a drug trafficking crime." _ (Emphasis added). In future instructions, we caution the district court to endeavor to avoid generic references to "a drug trafficking crime" when referring to the particular predicate offense.  -22- 22 giving, or withholding, of a supplemental instruction, or the contents of it if given," United States v. Parent, 954 F.2d _____________ ______ 23, 25 (1st Cir. 1992), we nonetheless find that the district court transgressed the bounds of its discretion under the unusual set of circumstances that unfolded after the jury retired to deliberate. See United States v. Akitoye, 923 ___ _____________ _______ F.2d 221, 227 (1st Cir. 1991) (reviewing for abuse of discretion district court's denial of jury's request to have testimony read back). We outline the relevant history.  The jury began its deliberations in earnest10 on the morning of November 22, 1994. After a few hours, the jury sent the court a note, asking "Which scale was found in the bedroom and which scale had the fingerprint?" After consulting the parties, the district court responded, "It would not be proper for me to tell you what the evidence establishes or does not establish. That's a matter that only you can determine." Later, the jury sent another communication to the court, this time stating, "We do not have an [sic] unanimous decision on Count Number Two. Must we continue to discuss until we have? It is apparent that we'll not change our minds." At a chamber conference with both counsel, the court proposed the following response:  ____________________ 10. The court submitted the case to the jury the previous evening. After deliberating for approximately fifteen minutes, however, the jury chose to go home and reconvene the next morning. -23- 23 "Would reading any portion of the testimony to you assist you in reaching a decision? If so, please tell me what portions of testimony of which witness you would like." Perceiving deadlock on Count II, Manning's attorney objected to the court's response and moved for a mistrial. In the alternative, he proposed that the response advise the jury that it was not obliged to reach a verdict. The district court denied the motion, rejected the suggestion, and sent its suggested response. The jury then informed the court, "We would like to hear testimony from Officer Lennon and Agent Lennon." Over Manning's continued objection, the court replied, "Is their [sic] any particular portion or portions of the testimony of Officer Lennon or Agent Lennon that would be helpful to you?" After receiving no reply, the district court had the clerk ask the jurors whether they wished to continue deliberating or go home and return the next day. Thereafter, the court received a note stating that a verdict had been reached. Apparently concerned about the effect of its second response, the district court, before taking the verdict, queried the jury collectively in open court as follows: I just wanted to make sure before I even ask about the verdict whether there is anybody here who is under the impression that you were required to reach an [sic] unanimous decision. If you didn't, you'd be kept here until you did. I wanted to make sure nobody is under that impression, had the feeling you had to -24- 24 reach an agreement because you felt that you would be kept here until you did or because you felt that you had to all agree in order to be released from jury service. Is there any of you that had that feeling? No juror responded to the inquiry. The jury then returned its verdict of guilty on all counts.  This court has recognized that when a jury indicates that it is deadlocked, a supplementary charge instructing it to return and attempt to reach a verdict may prejudice a defendant. See United States v. Angiulo, 485 ___ ______________ _______ F.2d 37, 39 (1st Cir. 1973). For instance, "such a charge may cause a jury to agree when they might otherwise never have come to agreement, thereby losing for the defendant whatever safeguard he might have had in a hung jury, a declaration of mistrial, and either a new trial or a subsequent decision by the prosecutor not to retry the case." Id. Accordingly, we have instructed district courts to ___ include three elements in any such supplementary charge to ameliorate its prejudicial effect. Id. A district court ___ should instruct jurors in substance that (1) members of both the majority and the minority should reexamine their positions, (2) a jury has the right to fail to agree, and (3) the burden of proving guilt beyond a reasonable doubt remains with the government. Id.  ___ Having indicated that it was deadlocked on Count II, the jury in the present case proceeded to inquire whether -25- 25 it was obliged to reach a verdict on Count II. Rather than answering this pointed question "yes" or "no," the district court responded with a question: "Would reading any portion of the testimony to you assist you in reaching a decision?" This response not only failed to discourage the notion that the jury was bound to continue to deliberate indefinitely, it suggested the opposite, i.e., that a jury is required to do ____ so.11 Having asked whether continued deliberation on Count II was necessary, and being offered a review of testimony in response, a rational lay jury could reasonably have inferred that the court wanted it to reach a verdict, regardless of whether it could do so in good conscience.  Having sent the jurors an improper signal, the district court did not dispel this misimpression by collectively asking the jury in open court, after it had reached its verdict, whether that verdict had been coerced. At that point, the dynamics had fundamentally changed. Jurors who may have been hold-outs earlier had now voted to convict. Asking such a juror to admit before his fellow jurors that he had voted against his will was asking too much. Moreover, the district court never informed the jurors  ____________________ 11. Providing a modified Allen charge at this juncture, on _____ the other hand, would have informed the jurors that they need not surrender an honest conviction for the mere purpose of returning a verdict and at the same time encouraged them to try to reach a verdict, fully aware that the onus of reexamination is not on the minority alone and that the burden of proof remains with the government. -26- 26 that if any of them did admit to being coerced, the court would take their verdicts on Counts I and III, discharge the jury, and retry Count II before another jury. The unhappy prospect of being sent back to the jury room for further deliberations may also have prevented jurors from admitting coercion. Because we cannot say that the verdict on Count II was not the product of coercion, we vacate the conviction on Count II and remand for a new trial.  III. III. ____ CONCLUSION CONCLUSION __________ We affirm Manning's convictions and sentences on ______ Counts I and III, vacate his conviction and sentence on Count ______ II, and remand Count II for a new trial. ______ -27- 27