**Joseph JACKSON and Sayzon L. Ford, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 98–CF–1620, 99–CF–99.**

District of Columbia Court of Appeals.

Argued Jan. 9, 2001.
Decided March 8, 2001.

---

William C. Claiborne, for appellants.

Marc O. Litt, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth Trosman, Mary Patrice Brown, Amy Salvin, and Ben Friedman, Assistant United States Attorneys, were on the briefs, for appellee.

Before FARRELL, RUIZ, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

These consolidated appeals from drug convictions present the issue, among others, of whether the trial judge in each case erred in refusing to order disclosure of information under Super. Ct.Crim. R. 16 which the defendants claimed was relevant to their decision whether to call as a witness and cross-examine the chemist who analyzed the controlled substances in question. *See* D.C.Code § 33–556 (1998). Principally at issue is a Drug Enforcement Administration (DEA) Form 86, a worksheet which documents the tests performed by the chemist and the results thereof. The government told us at oral argument that it now routinely furnishes this document to the defense before trial, but it nonetheless defends the rulings of both judges that the DEA–86 is not discoverable under Rule 16. We disagree and

hold that the DEA–86, to the extent it contains "results or reports of scientific tests or experiments" performed on the material alleged to be a controlled substance, is discoverable under Rule 16(1)(D). In only one of these cases is the completed DEA 86 part of the record, and in neither case is the record sufficient for us to determine whether the nondisclosure of the document was harmless error. We therefore will remand the record in each case for findings by the trial judge relevant to our decision of whether the erroneous nondisclosure was prejudicial. *See Davis v. United States*, 564 A.2d 31, 42 (D.C.1989) (en banc). Appellants' remaining arguments, including Jackson's contention that the trial court erroneously excluded testimony by his proffered expert on the feasibility of fingerprint identification, provide no basis for reversal.

## I.

A jury convicted appellant Jackson of possessing cocaine with intent to distribute, based on testimony by police officers that he threw away a plastic bag containing 23 ziplocks of cocaine while running from them, then returned to the area and, believing himself unobserved, searched for and retrieved the drugs with a flashlight. (The facts relevant to Jackson's conviction are discussed in greater detail in part II, *infra*.) Appellant Ford was convicted by a jury of distributing cocaine and by the court of possessing marijuana, based on testimony of an eyewitness police officer that Ford sold cocaine to a third person (stopped soon afterwards as she sought to throw the cocaine away) and had marijuana on his person. In both cases the government proved the identity and quantity of the controlled substance by introducing the DEA Form 7, setting forth the results of the chemical analysis, and a notarized "Report of Chain of Custody and Certification of Compliance Pursuant to 33 D.C.Code § 556."

Before trial in each case, the defense moved for production of additional DEA

documents related to the chemical testing, and in each case the trial judge ruled that the documents were not discoverable under Rule 16. On appeal, the defendants primarily claim error in the refusal to order disclosure of the DEA–86, a document they claim was material—indeed, important—to their decision whether to exercise the right to call and question the chemist "as on cross-examination," conferred by D.C.Code § 33–556. We find merit in this claim.

### A.

■ Only in Jackson's case is the DEA–86 prepared for the drugs in question part of the record before us, although in Ford's case the defense attached a sample DEA–86, completed in another case, to the motion to compel production. The form is entitled "Forensic Chemist Worksheet" and on the front side generally mirrors the information listed on the DEA–7—that is, it summarizes the analysis of each substance and has spaces to list its "active drug ingredient," the "quantitative results" or "concentration," the "am[oun]t of pure drug," and the "reserve." On the back side, unlike the DEA–7, it provides for a more detailed description of the tests performed, broken down to include, among other things, the "evidence sampling procedures," "qualitative" analysis, and "quantitation," with the latter differentiated by "method # " and various weight classifications.

Super. Ct.Crim. R. 16(a)(1)(D) provides that, "[u]pon request of a defendant the prosecution shall permit the defendant to inspect and copy or photograph *any results or reports of* . . . scientific tests or experiments . . . which are within the possession . . . of the government . . . and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at trial" (emphasis added). We have no doubt that the DEA–86 is a "report," and contains "results," of scientific tests done on controlled substances submitted to the DEA for analysis. Although the DEA–7 is "the official report . . . of analysis of a controlled substance" which the government routinely introduces at trial to comply with D.C.Code § 33–556, the DEA–86 is no less a report of the results of the chemical analyses in a format partly mirroring the DEA–7. The difference of note, as we explained, is that the back side of the form provides for more detailed description of the analyses (qualitative and quantitative) yielding the particular results. Setting forth as it does the detailed tests and results summarized in conclusory fashion by the DEA–7, the DEA–86 is discoverable under the broad command ("any results or reports") of Rule 16(a)(1)(D).[1]

■ However, since the DEA–86 is not "intended for use by the government as evidence in chief at trial," it must be "material to the preparation of the defense" to be discoverable. In general, our decisions have interpreted that requirement of Rule 16 liberally. It looks only to "the potential value of the evidence" to competent defense counsel, *Wiggins v. United States*, 386 A.2d 1171, 1174 (D.C. 1978), asking whether there exists "a reasonable indication that the requested evidence will either lead to other admissible evidence, assist the defendant in the preparation of witnesses or in corroborating testimony, or be useful as impeachment or rebuttal evidence." *United States v. Curtis*, 755 A.2d 1011, 1015 (D.C.2000) ("The threshold showing of materiality is not a high one.").[2] Materiality is easily demon-

1. *Waldron v. United States*, 370 A.2d 1372 (D.C.1977), is not to the contrary. As a structured form that summarizes the tests performed and results obtained, the DEA 86 is not equivalent to "the rough laboratory notes"—the "pedestrian details" of the analysis—we held not discoverable in that case.

370 A.2d at 1373. To the extent the completed DEA 86 contains notes or jottings that do not reflect the "results or reports of . . . tests," the trial court may require them to be redacted in accordance with *Waldron*.

2. Elsewhere in *Curtis*, it is true, we appeared to raise the materiality standard "high[er]" by

strated in this case. Since § 33–556 commits to the defense the choice whether to call the chemist in a drug prosecution as a witness, *see Howard v. United States*, 473 A.2d 835 (D.C.1984) (upholding the statute's constitutionality in permitting the government to prove the identity of the drug through admission of DEA reports), competent defense counsel—possessing only the DEA–7—would necessarily find the DEA–86 of assistance in deciding whether subpoena of the chemist in an attempt to impeach his conclusions would be worth the candle.[3]

### B.

Accordingly, appellants, were entitled to discovery of the DEA–86. The remaining question is whether the nondisclosure was prejudicial to them. *See Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Only one of the DEA 86's prepared in the two cases is part of the record, and neither record is

sufficient for us to decide whether any inconsistencies between those forms and the DEA–7's introduced at trial are sizeable enough to call in question the government's proof of the identity of the substances analyzed. The assistance of the trial court is therefore necessary. Under our decision in *Davis v. United States, supra*, we will remand for consideration of the issue by the trial judge in each case, who may make the necessary comparison and transmit her findings to us. *See Davis*, 564 A.2d at 42 (where court of appeals has "an incomplete record upon which to assess harmlessness," remand is appropriate for trial court "to make the proper evidentiary record and return the matter to this court").

### II.

Appellant Jackson contends that the trial court erred in refusing his pretrial request for appointment of a combined fin-

---

stating, in the context of requested disclosure of DEA documents: "[T]o demonstrate materiality, [the defendants] must make some preliminary showing of a reason *to doubt* the chemical analysis provided by the government." 755 A.2d at 1015 (emphasis added). In *Curtis*, however, unlike the present case, the DEA–86, the underlying spectral analysis of the drugs, and a DEA affidavit describing the agency's test procedures and equipment had all been turned over to the defense, *see id.* at 1013, which was demanding still additional background documents related to DEA testing. *See id.* Given the indications that this broad request was a fishing expedition, we held that the defense would have to furnish information by affidavit or otherwise "contradict[ing] or call[ing] in question" the documentation already disclosed before further intrusion into DEA's internal processes would be sanctioned. *Id.* at 1015 n. 8; *see also* Rule 16(a)(2) (except as otherwise provided in rule, Rule 16 "does not authorize the discovery [of] ... internal government documents made by ... any ... government agent investigating ... the case").

**3.** Appellants contend they were entitled to two additional documents under Super. Ct. Crim. R. 16(a)(1)(E) ("Expert witness"), *i.e.*, a "written summary" of the anticipated testimony of the chemist and a statement of "the

witnesses' qualifications." We in essence rejected this claim in *United States v. Curtis, supra*, holding:

> Rule 16 (a)(1)(E) ... does not apply to this case because the DEA chemists were not going to testify at trial as expert witnesses in the government's case in chief.

755 A.2d at 1016. Further, as to the requested "written summary," neither appellant explains why the combination of the DEA–86 and the DEA–7, both discoverable, does not give the defense the equivalent of that summary.

Although the chemist's "qualifications" are not discoverable under Rule 16(a)(1)(E) if the government does not "intend[ ] to" call him as a witness, appellants *would be* entitled to the chemists's curriculum vitae under Rule 16(a)(1)(C) as "material to the preparation of the defendant's defense" if it exists in the form of a "document[ ] ... within the possession, custody or control of the government." That document, presumably a routine part of the chemist's personnel jacket, would not be shielded by the "work product" limitation of Rule 16(a)(2). *See* 2 WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 3d § 254, at 115–16 (2000) (work product limitation of Fed. R.Crim.P. 16 "runs to ... documents made by the government ... agents in connection with the investigation or prosecution of the case").

gerprint and crime scene search expert under D.C.Code § 11–2605(a) (1995). He further argues (or appears to argue, reading his brief generously) that the court erred in excluding the proposed testimony of his fingerprint expert regardless of whether Jackson was seeking compensation for the expert under § 11–2605(a). To evaluate these contentions, we need to describe the evidence of the alleged crime and the procedural background more fully.

## A.

According to the government's proof, at about ten o'clock one evening Metropolitan Police Department (MPD) officers in unmarked cars and plain clothes, but wearing brightly-colored police armbands, saw Jackson and others drinking from open containers of alcohol. The group scattered when one of the police yelled "Jump out!". Investigators Soto and O'Bryant chased Jackson on foot as he ran behind an apartment building into an alley. As Jackson approached a fence along the alley, Soto saw him throw an object into nearby bushes. O'Bryant too saw him throw the object but did not see where it landed. Soto lost sight of Jackson after he scaled the fence, but O'Bryant continued the chase and caught him in front of the apartment building. He patted Jackson down and released him. Meanwhile Investigator Littlejohn, who had observed the chase, joined Soto in looking for the narcotics. He saw Soto retrieve a clear plastic bag holding smaller black ziplocks from the bushes near the fence.

The officers decided to leave the bag where it was and set up observation posts to see if anyone came looking for it. Littlejohn hid underneath a nearby pickup truck, and Soto and O'Bryant concealed themselves nearby. Three to five minutes later Jackson walked back between the apartment building and the fence and briefly looked around in the bushes. He then walked back to the front of the build-

ing and returned with a flashlight. Littlejohn and Soto watched as he again searched the bushes and picked up the plastic bag. Littlejohn told the team by radio to move in, and when Jackson saw them do so he yelled "Oh Shit!" and fled down the alley, tossing the bag into the bed of the pickup truck, from which the police retrieved it. Soto caught Jackson in front of the building. Littlejohn performed a field test on the contents, which proved positive for cocaine.

Jackson's defense was denial that he had possessed the cocaine at any time, combined with the suggestion that the failure of the police to adequately document the crime and attempt to obtain fingerprints from the plastic bag showed an overzealous effort to justify a costly drug surveillance ("eleven people and three cars") by arresting anyone, even someone innocent like himself. Testifying in his behalf, Jackson stated that he had run from the police initially because he feared harassment by O'Bryant, who had harassed him previously. When O'Bryant first caught him in front of the building, he took Jackson's keys, pager, and personal effects and threw them on the ground. Jackson walked home but found that he was locked out, and thinking he might have dropped his keys back at the apartment building, borrowed a flashlight and went back to look for them. The police chased him again and arrested him.[4]

In cross-examining the police witnesses, Jackson elicited that they had not called for a crime scene search specialist or attempted to retrieve fingerprints from the plastic bag. On redirect examination, Officer Soto testified that he had not taken these steps because the police had caught Jackson with the bag in his possession, and, in Soto's experience, fingerprints could almost never be lifted from wrinkled surfaces such as a plastic bag.

---

4. Jackson's girlfriend, Latoya Mason, confirmed his testimony that he had returned to

the scene to look for his keys after meeting her on the street.

## B.

Jackson made a pretrial request under D.C.Code § 11–2605(a) for appointment of a fingerprint expert, Larry Lockhart, who the defense expected would testify (as Jackson stated in his written motion) that

- the fact that no crime scene search officer was called to the scene violated both MPD General Orders and the U.S. Attorney's Office papering standards;
- the police officers [had] a duty to preserve evidence so prints could be taken per both MPD General Orders and the U.S. Attorney's office papering standards;
- the police officers [had] a duty to call an evidence technician to the scene per both MPD General Orders and the U.S. Attorney's Office papering standards . . .; [and]
- prints can be left on and recovered from a ziplock.

According to the request, Lockhart would opine on "the general principles of crime scene evidence preservation, collection and analysis," and on "the science of fingerprints [and] their collection, recovery and analysis" in particular.

In a written pretrial order, the trial judge denied the motion to appoint Lockhart as an expert at public expense, pointing out that

[w]ith respect to the first three issues [quoted above], . . . each may be sufficiently explored by cross-examination of the testifying officers and introduction into evidence of any relevant MPD General Orders and papering standards of the U.S. Attorney's Office.

Concerning "whether fingerprints can be recovered from a ziplock," the judge reasoned that "this issue is both irrelevant and collateral to the issues to be determined at trial":

The issue to be determined by the jury is whether the officers' testimony about viewing the defendant in possession of the bag of drugs is credible. Certainly the defense can argue that the absence of any fingerprint evidence is a factor that the jury can consider in determining whether the government has proved the fact of possession beyond a reasonable doubt. . . . But in a case such as this, where it is uncontroverted that the MPD made no efforts to obtain fingerprints from the physical evidence, the Court does not believe that calling an expert to testify about an additional method of lifting fingerprints, which method also was not attempted in this case, will assist the jury in deciding the relevant facts.

Further, the judge concluded, any minimal relevance the testimony had would be "outweigh[ed by] its tendency to confuse the jury."

Following Officer Soto's explanation at trial for not having sought fingerprints, Jackson again asked for leave to call Lockhart, who had formerly been head of a police evidence laboratory and was prepared to testify to "recovery rate[s]" in the case of drug evidence of between thirty-five and sixty percent. The trial judge once more determined "the issue of the fingerprint examination to be very collateral" and to have "very minimal probative value for the jury" where "there [were] no fingerprints being introduced by the Government," but reminded Jackson that he could "argue the absence of the fingerprints" to the jury. The next day Jackson's attorney asked permission to introduce as "substantive evidence" both the MPD General Order and the U.S. Attorney's Office papering standards referred to earlier, copies of which were in his possession. When he handed the judge the latter document, she examined it and ruled it inadmissible because "on its face" it governed only prosecutors and was not "applicable to MPD." Jackson did not ask the judge to examine the MPD General Order, did not press for a ruling on its admissibility, and made no further attempt to introduce it into evidence.

Because of Jackson's cross-examination on the failure to secure fingerprints, the prosecutor requested a jury instruction that under District of Columbia law the government has no affirmative duty to do fingerprint tests. Jackson's attorney objected that reference to no "affirmative duty" would not "be a correct statement of the law," but acknowledged that "we [could] say something like that, no legal duty or something." Ultimately the judge gave the instruction as requested, without further objection. The judge declined Jackson's request to instruct that an officer's failure to collect physical evidence "to corroborate his version of the events can be considered in judging his credibility," stating that counsel could argue the point. In summation, Jackson repeatedly argued that the police had made no effort to lift fingerprints from the package or call a crime scene search technician, facts the jury should consider in deciding whether their version of events was credible or whether they had "start[ed] preying on ... people that can't protect themselves," shown "contempt for Mr. Jackson because they didn't take a single item of physical evidence," and "snatched [him] up ... at the end" because their costly police surveillance had not yielded "as many people as [they] thought" it would.

## C.

■ Under D.C.Code § 11–2605(a), "[t]he court must provide a defendant with expert services ... whenever there has been a showing that the accused is financially unable to obtain the service and the service is 'necessary to an adequate defense.'" *Dobson v. United States,* 426 A.2d 361, 367 (D.C.1981). We have held that in considering a request for such services, "the trial court should tend to rely on the judgment of defense counsel who has the primary duty of providing an adequate defense," although the court does not act as a "rubber stamp." *Gaither v. United States,* 391 A.2d 1364, 1368 (D.C. 1978). Requests for expert services

"'must be evaluated on a standard of reasonableness,'" *id.* (citation omitted), focusing on whether "a reasonable attorney would pursue" such services in aid of a defense, *id.* at 1367, but recognizing that the state need not "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy." *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

■ In support of the trial judge's denial of the § 11–2605(a) request by Jackson, the government first defends the judge's conclusion that testimony by Lockhart would be "irrelevant and collateral" because it was "uncontroverted that the MPD made no efforts to obtain fingerprints from the physical evidence." We do not agree that this made the proffered testimony irrelevant. Jackson's argument was that the failure itself to attempt to lift fingerprints from the plastic bag, something his expert would say was commonly done with success, might plant a reasonable doubt in jurors' minds about the motives of the police—or at least their indifference to their legal obligations—in arresting him. Although the need for a defense fingerprint expert might have been greater had the prosecutor sought to prove that Jackson's print was actually on the bag, *see United States v. Durant,* 545 F.2d 823 (2d Cir.1976), Lockhart's proffered testimony was not irrelevant under the liberal definition of that standard employed in this jurisdiction. *See, e.g., Reavis v. United States,* 395 A.2d 75, 78 (D.C.1978); *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977).

■ Assuming that the proffered testimony had some relevance, the government nevertheless argues that the trial judge enjoys discretion in ruling on a request for expert services at public expense, *see Carle v. United States,* 705 A.2d 682, 686 (D.C.1998); *Berry v. United States,* 528 A.2d 1209, 1210 (D.C.1987), and that, as in *United States v. Manning,* 79 F.3d 212 (1st Cir.1996), the judge could fairly conclude here that how thoroughly the police

conducted the investigation—specifically, not trying to obtain fingerprint corroboration—was only marginally helpful to Jackson's defense that he never possessed the drugs and "had the potential of diverting [the jury's] attention from its task of assessing the adequacy of the prosecutor's evidence on the issue of guilt." *Id.* at 219.[5]

In the circumstances of this case, we agree with the government that the trial judge did not abuse her discretion in denying the request for expert services. We reach that conclusion both because of the alternative means Jackson had by which to challenge the adequacy of the police investigation, including the failure to attempt fingerprints, and because on the evidence presented the judge could fairly conclude that Lockhart's testimony—which could apply to any drug prosecution in which fingerprint analysis had not been attempted—would not appreciably assist the jury in resolving the issue of Jackson's guilt.

The *in limine* request to retain Lockhart in essence stated that he would testify that the failure to summon a crime scene expert for fingerprint analysis violated MPD's internal regulations and U.S. Attorney papering standards, and that such "prints can be left on and recovered from a ziplock." In denying that request, the trial judge left the defense free rein to cross-examine the police about the alleged breach of their regulations and stated that "any relevant MPD General Orders and papering standards" could be introduced

as substantive evidence. At trial, when Jackson again asked leave to call Lockhart, the judge repeated her decision and also ruled the U.S. Attorney's Office papering standards inadmissible, but made no decision—because she was not asked to—on the admissibility of the MPD General Order. Indeed, by excluding the U.S. Attorney's Office standards because they were not binding on the Metropolitan Police, she strongly implied that Jackson would be free to use the MPD General Order in cross-examining the police witnesses and as substantive evidence of the indifference—or worse—with which the police carried out the investigation.[6] If, as Jackson maintained, the General Order itself reflected MPD's judgment that fingerprint analysis was feasible and to be pursued in drug cases, then it is difficult to see how testimony by Lockhart that such testing was possible or that the police had violated the General Order would have added significantly to the defense.

Furthermore, by the time the trial judge reconsidered Jackson's request to retain Lockhart, she had heard both the government's case and Jackson's defense as presented through his testimony, and was able to judge on that record whether Lockhart's testimony promised to "enhance" the "potential accuracy of the jury's determination" of guilt. *Ake v. Oklahoma,* 470 U.S. at 83, 105 S.Ct. 1087. Three police officers had testified, collectively, that

---

5. *Manning* was a prosecution for using or carrying destructive devices during and in relation to a drug trafficking crime, in which police testified they had seen Manning enter a building holding a briefcase containing the devices, but he escaped (leaving the briefcase behind) apparently by climbing through a broken basement window. The court of appeals held that the police's failure to fingerprint the broken glass from the window—which the defense expert would have "highlighted" as sloppy work—was "peripheral to Manning's defense" given the eyewitness and physical evidence (the bag's contents) which the prosecution did present. 79 F.3d at 218–19. The court also noted that "Manning's attorney was able to place these alleged investigative shortcomings before the jury on

cross-examination of the officers." *Id.* at 219 n. 3.

6. In disputing the trial judge's exclusion of the U.S. Attorney's Office papering standards, Jackson cites only cases holding that similar documents may be admissible over hearsay objection. He makes no effort to challenge the ruling on the basis the judge stated, namely that the papering policy did not represent a standard MPD imposed on its own officers, and thus could not bind them. We find no error in the judge's conclusion that the papering standards were irrelevant to how MPD officers were required to conduct investigations.

Jackson threw a plastic bag of smaller cocaine ziplocks into bushes while fleeing them, returned to the scene minutes later with a flashlight and retrieved the bag, and discarded it again when they tried to arrest him. Investigator Soto, asked on cross-examination why a crime scene search officer had not been summoned, explained partly that they considered this unnecessary since Jackson "had [the drugs] in his possession already. We saw him with [them]." Jackson did not dispute returning to the scene and rustling about in the bushes with a flashlight, but claimed he was looking for his keys.

On these facts, the judge did not abuse her discretion in denying the request for appointment under the statute. Lockhart's proffered testimony that evidence retrieval techniques allow recovery of fingerprints from ziplocks was not based on anything particular to this case—Jackson did not maintain, for example, that Lockhart had examined the plastic bag or ziplocks recovered and would testify that they were suitable for fingerprinting.[7] By contrast, Soto testified that he had been told by crime scene experts that a bag like the one seized, having "too many wrinkles in a ball like that," would almost never yield fingerprints. Moreover, it was apparent that Jackson's defense, to succeed in raising a reasonable doubt, required more than that the jury fault the police for having spurned an available corroborative technique. Jackson had to overcome the implausibility of a defense that the police, given an initial opportunity to (falsely) arrest him for possession of the cocaine, released him anyway in the hope he would return to the scene so that they could claim (falsely) to see him holding the drugs

a second time. Why the police would pursue so roundabout a means of snaring an innocent person could not be explained merely by inferences from the fact that their investigation had been careless.[8]

We emphasize the limits of our holding. The showing a defendant must make to obtain expert services on a theory such as Jackson's is not a demanding one. A proffer, for example (there might be others), that someone among persons in the immediate vicinity of where the defendant allegedly threw away drugs was the actual possessor could well call for appointment of a requested expert to examine the drug package and, if able, opine that any fingerprints on it could have been lifted. We entrust that and similar decisions to the good sense of the trial judge, though guided by our recognition in *Gaither, supra,* that the question is whether a reasonable attorney would retain the services of the expert, "tend[ing] to rely on the judgment of defense counsel who has the primary duty of providing an adequate defense." 391 A.2d at 1368. Our decision in this case rests upon its particular factual setting, including the alternative means Jackson had to impeach on the purported inadequacy of the investigation.

### D.

As pointed out, however, Jackson also appears to argue that Lockhart was ready to testify and render his expert opinion on the feasibility of fingerprint recovery whether or not the trial judge appointed him at public expense, and that the judge barred his testimony nonetheless because of her conclusion that it was irrelevant. That fact, Jackson asserts, takes the analysis outside the framework of the trial

---

**7.** Jackson does not contend that he requested and was denied access to the bag or ziplocks for submission of them to Lockhart.

**8.** Jackson argues that the exclusion of Lockhart's testimony was prejudicial given the trial judge's instruction to the jury that "under the law of the District of Columbia, the Government is under no affirmative duty to do fingerprint tests." Jackson, however, object-

ed only to use of the words "affirmative duty," conceding that the judge could instead say "no legal duty or something." The difference in formulation escapes us. Since Jackson was allowed to cross-examine and argue at length concerning the failure of the police to attempt fingerprint analysis, the judge did not commit plain error.

court's discretion under § 11–2605(a) and requires us to ask simply whether the judge erred in excluding the evidence and, if so, whether the error requires reversal—both of which, naturally, Jackson would answer in the affirmative.

The government responds that determinations of relevancy are themselves committed to the sound discretion of the trial court, see, e.g., Dockery v. United States, 746 A.2d 303, 307 (D.C.2000), and that the judge's determination that Lockhart's testimony would have "very minimal probative value" and divert the jury from the central issues was not an abuse of that discretion. For the reason stated earlier, however, we think Jackson is correct that the trial judge erroneously assessed the relevance of the evidence. Admissibility of Lockhart's testimony should not have turned on whether the government itself introduced fingerprint evidence, see Durant, supra, because Jackson's defense was that his wrongful arrest stemmed from the officers' neglect, at least, of their duty to gather available fingerprint evidence. The relevance of Lockhart's testimony to that defense was heightened once Investigator Soto was allowed to testify that, in the view of police experts, fingerprint analysis was futile in cases such as this. Viewed purely as a question of admissibility, therefore, we think the court erred in denying Jackson's request to call Lockhart to testify.

The question, then, is whether we can say with fair assurance that the exclusion of this testimony did not have a "substantial and injurious effect or influence on the jury's verdict." Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[9] We are satisfied that it did not have that effect. As pointed out previously, the judge did not foreclose use

by Jackson of the General Order to impeach Soto's opinion of the futility of attempting to lift fingerprints. To the extent that document represented an official view of the MPD contrary to Soto's, Lockhart's testimony on feasibility would largely have echoed and confirmed that view. On the other hand, the value of Lockhart's opinion was somewhat discounted by his unfamiliarity with the drug receptacles in this case, see note 7 and accompanying text, supra—in contrast to Soto, who had seen the "ball[ed]" condition and the "many wrinkles" of the plastic bag. Most importantly, as we have observed, Jackson's defense had a serious problem of plausibility, resting as it did on the notion that the police had passed up one opportunity to arrest him falsely or recklessly for alleged drug possession and instead delayed on the chance that he would return to the scene and give them another opportunity to do so. Weighed against the detailed and essentially consistent testimony of three officers, any corroborative support Lockhart's testimony would have given to this defense in prompting a reasonable doubt was minimal.

### III.

Jackson's remaining arguments for reversal are unpersuasive and require no discussion. Appellant Ford's remaining contentions also furnish no ground for reversal. The DEA–7 analyses and Certificates of Compliance were properly admitted into evidence in his case. See D.C.Code § 33–556; Howard, 473 A.2d at 839–40. Officers Posey and Branham were correctly allowed to testify to their belief that Ford's actions as they drove into the neighborhood bespoke a drug transaction. See Bedney v. United States, 684 A.2d 759, 767 (D.C.1996); Carter v.

---

9. Given the means Jackson had at his disposal-in particular the MPD General Order—to urge to the jury that the police knew fingerprint analysis was feasible yet disregarded it, no meritorious claim can be made that exclusion of Lockhart's testimony was constitutional error. Cf. Gardner v. United States, 698

A.2d 990, 997 (D.C.1997) ("Constitutional error [in limiting bias cross-examination] will be found only when 'the trial court's rulings prohibited all inquiry into the possibility of bias under [the] defendant's theory.' ") (emphasis in original; citations omitted).

*United States*, 614 A.2d 913, 919 (D.C. 1992). Nor was Ford prejudiced by the prosecutor's failure to provide him with an expert report before trial setting forth the basis of the expected testimony of Detective Colmes.

To conclude, we retain jurisdiction over these appeals and remand the record in each case for further proceedings in accordance with our opinion in part I, *supra.* Our judgment will await the result of those proceedings and the return of the supplemented record to us.

*So ordered.*