835 A.2d 600

**Rico Duvall COLE**

v.

**STATE of Maryland.**

**No. 5, Sept. Term, 2003.**

Court of Appeals of Maryland.

Nov. 12, 2003.

Geraldine K. Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

Rico Duvall Cole, Petitioner, challenges his convictions in the Circuit Court for Prince George's County for possession of cocaine and possession of cocaine with intent to distribute. Cole's intended expert witness at trial, James Slunt, a chemist, was not allowed to testify because the trial court determined that Slunt did not have a sufficient factual basis upon which to base his opinion as to the quality controls employed in the Prince George's County Police Drug Analysis Laboratory or the specific testing of the suspected cocaine evidence in Cole's case. Cole argues that the improper exclusion of Slunt's proffered testimony was caused by the State's improper refusal of his requests during pre-trial discovery to provide certain information and documents regarding the procedures at the laboratory and the trial judge's denial of his motion to compel the State to provide that information and documents. We conclude that, because Cole was entitled to some of the withheld information and documents, the basis for the trial judge's exclusion of Slunt's testimony was erroneous. We conclude also that this error was not harmless. Accordingly, we shall reverse the judgments and remand the case for a new trial.

## I. Facts

On 13 January 2000, Prince George's County police officers, pursuant to a search warrant, seized forty-six "baggies" of suspected crack cocaine, $2,340 in currency, miscellaneous documents, and two handguns from an apartment in Suitland,

Maryland. Cole was one of three men found and arrested in the apartment. The Prince George's County Police Drug Analysis Laboratory (the "laboratory" or "lab") subsequently concluded, based on tests it conducted, that the substances within the confiscated "baggies" contained cocaine. Cole was charged with, among other crimes, possession of cocaine and possession of cocaine with intent to distribute.

Cole requested from the State, in the course of pre-trial discovery, several documents related to the laboratory's determination that the substances were cocaine.[1] The State rejected his requests. On 1 May 2000, he filed a Motion to Compel Discovery seeking to obtain twenty-six items:

1. The names, addresses, job titles and qualifications of all persons who performed any analysis in this case, or any person who may have come into contact with or any person acting in a supervisory capacity with regard to the analysis of the substance at issue in this case;

2. The education, qualifications, and approved training programs completed by each chemist and analyst in the Prince George's County Drug Laboratory or any analyst who may have had contact with substances or equipment and in the analysis process in this case, pursuant to COMAR 10.10.03.04 and .05;[2]

3. The results of any proficiency tests given to each chemist or analyst employed by the Prince George's County Drug Laboratory;

---

1. The record reflects that, as the result of publicity stemming from the 1999 firing of a civilian chemist from the lab, accusations of "problems" and "scientific irregularities" at the lab swirled throughout the Prince George's County Bar, public and private, as well as the local Bench. The accusations also received local media attention. A groundswell in discovery demands made upon the State by defendants in drug cases where the lab had tested the alleged drug evidence was an additional consequence of this speculation. Cole's case was but one of many where this occurred.

2. Since recodified at COMAR 10.10.09.01 and .02.

4. Whether each chemist and analyst has ever been decertified pursuant to COMAR 10.1003.06 [3] and if so, the dates and reasons for such decertifications;

5. All materials listing the drug-identification procedures used by the Prince George's County Drug Laboratory pursuant to COMAR 10.10.03.07; [4]

6. Any guidelines issued by the Department of Health and Mental Hygiene setting quality control standards pursuant to COMAR 10.10.03.08(F); [5]

7. All bench notes and any other written material made by the chemist/analyst with regard to this case;

8. The entire file compiled by the chemist/analyst for this case;

9. The entire Chain of Custody log and any addendum thereto;

10. The protocols used for analyzing controlled dangerous substances;

11. The instrument conditions for each method used in analyzing controlled dangerous substances in this case including, but not limited to, all temperature records, any specific columns which were used, the source, nature, content and testing with regard to any solvent or carrier gas which was used in this case;

12. The methods used in analyzing controlled dangerous substances and a copy thereof;

13. Positive and negative controls used in analyzing controlled dangerous substances and a copy of the printout for this case;

14. Verification of standards used in analyzing controlled dangerous substances and the standards themselves;

---

**3.** Since recodified at COMAR 10.10.09.03.

**4.** Since recodified at COMAR 10.10.09.04.

**5.** Since recodified at COMAR 10.10.09.05(F).

15. All manufacturer's instructions for the use or maintenance of the instruments used in testing controlled dangerous substances in the Prince George's County Drug Laboratory;

16. Methods used in testing the controls from independent suppliers;

17. Any independent audits of the Prince George's County Drug Laboratory, including but not limited to, the dates of such audits, the person or persons conducting such audits, the results of the audits and any materials or reports completed as part of the audit;

18. Any in-house proficiency testing done, including but not limited to, the dates of such testing, the person or persons conducting such testing, the results of the testing and any materials or reports compiled as a result of such testing;

19. Any other material relevant to and prepared for the analysis of controlled dangerous substances by the Prince George's County Drug Laboratory[;]

20. Copies of traceability documentation for standards and reference materials used during analysis, including unique identifications origins, dates of preparation and use, composition and concentration of prepared materials, certifications from suppliers, assigned shelf lives and storage conditions[;]

21. Sample preparation records, including dates and conditions of preparation, responsible analyst, procedure reference, purity, concentration and origins of solvents, reagents, and control materials prepared and used, samples processed concurrently, and extract volume[;]

22. Record of instrument operating conditions and criteria for variable, including as appropriate: GC column, lab file ID, tuning criteria, instrument performance check (e.g. ion abundance criteria), initial calibration, continuing calibration checks[;]

23. Procedure(s) for operation and calibration of analytical balances[;]

24. Results of calibration checks and mass traceability for gravimetric determinations[;]

25. Records concerning National Institute of Standards [and Technology] (N.I.S.T.) traceability of weights used in calibration[;]

26. Copy of laboratory's Quality Manual (however named).

After some false starts and judicial maneuvering, the trial court held a final evidentiary hearing on the motion. At the conclusion of the hearing, the court granted the motion with respect to items numbered seven and eight, which it found were related specifically to Cole's case, but denied the motion with respect to the other twenty-four items, which it found were directed toward the lab's general procedures, policies, and personnel.[6]

At trial, the court received, as part of the State's case-in-chief, the testimony of Ms. Milagros Mayo, the lab chemist who performed the tests on the seized substances from the "baggies" in Cole's case.[7] Mayo testified that she first performed three "screening tests" yielding results consistent with the substances being cocaine. These tests, however, could not identify conclusively the nature of the substances. She then tested the substances with an infrared spectrophotometer, which is capable of conclusively identifying a substance as cocaine. The infrared spectrophotometer produced a graphical representation of an infrared spectrum generated by the

---

**6.** The court also denied Cole's motion to order an independent audit of the lab and granted the State's request for a protective order to quash a defense-initiated subpoena issued to John Porter, the laboratory's manager. The trial court's denial of the motion to order the audit and its grant of the protective order are not at issue before this Court.

**7.** We note that Ms. Mayo was not received formally as an expert witness, but she was allowed to give opinion testimony. The nature of her testimony would not seem to fall under Md. Rule 5–701 ("Opinion testimony by lay witnesses"). *See also Robinson v. State*, 348 Md. 104, 123–24, 702 A.2d 741, 750 (1997). This oversight also is not at issue before this Court.

tested substances that was substantially similar to the spectrum generated by a "library" test result of a sample of pure cocaine previously run. According to Mayo, this was conclusive evidence that the substances tested were cocaine.

Mayo testified further that she next ran a test using a gas chromatograph/mass spectrometer (GCMS). When asked why she did so even though she already had a conclusive result from the infrared spectrophotometer test, she said "it was really redundant to use the GCMS," but that she wanted the GCMS test result as "part of the record." Like the infrared spectrophotometer, the GCMS, by comparing the sample in question to a known calibration sample, can identify conclusively a substance as cocaine. Mayo testified that the GCMS demonstrated conclusively that the seized substances were cocaine.

Just before Cole was to present his defense, the State moved, *in limine,* to exclude the testimony of James Slunt, an expert chemist who was to testify for the defense. Based on a proffer, the court was informed that Slunt would testify that, having reviewed the limited documents he had been given access to and having heard Mayo's testimony during the State's case-in-chief, he could not say that the State had demonstrated that the seized substances had not been contaminated, nor could he conclude, to a reasonable degree of scientific certainty, that the seized substances Mayo tested were cocaine. In particular, Slunt was prepared to testify that he had not learned of sufficient quality control procedures employed by the lab to convince him that Mayo's "conclusive" test results were accurate. The trial court found that Slunt did not have a sufficient factual predicate to so testify because, by Slunt's own admission, his knowledge of the laboratory's quality control procedures was incomplete. Cole's counsel, pointing out that Slunt's knowledge was incomplete only because the defense had not been provided with all of the previously requested information regarding the laboratory's procedures, renewed his discovery motion. The court denied the motion and refused to allow Slunt to testify before the jury.

The defense ultimately presented no evidence. Cole was convicted of possession of cocaine and possession of cocaine with intent to distribute. He was sentenced to twenty years' incarceration, with all but fifteen years suspended. On direct appeal, the Court of Special Appeals affirmed the judgments in an unreported opinion by a divided panel. We granted certiorari, *Cole v. State,* 374 Md. 82, 821 A.2d 369 (2003), to address Cole's arguments that the trial court erred in its handling of the discovery dispute and in excluding Slunt's testimony.

## II.

The pivotal issue is whether the trial court erred in resolving the discovery dispute as it did. Had the State been compelled to provide certain information about standard operating procedures at the laboratory, Cole argues, Slunt could have expressed a more informed opinion about the lab's procedures. Instead, Slunt was prevented from testifying because he did not have a sufficient factual basis to give a knowledgeable opinion. Neither the calibration record for the GCMS used to analyze the substances in Cole's case nor information regarding Mayo's proficiency testing was provided to the defense. Cole argues that he was entitled to examine these records in order to determine if he should challenge the accuracy of Mayo's findings.

Although Cole's brief before this Court included the same broad claims of entitlement to the information requested that he made in the Circuit Court and in the Court of Special Appeals, Cole's appellate counsel explained at oral argument before this Court that Cole alleges error now *only* as to the failure to grant the defense access to "the standard operating procedures including the quality assurance manual, in general, the calibration record that went to the GCMS, and the proficiency testing record for the chemist, Mayo." We interpret this narrowed challenge to implicate only parts of eight items requested in Cole's motion to compel: (1) those six items that would have assisted Slunt in coming to a conclusion regarding

the accuracy of the lab's procedures,[8] (2) information regarding the calibration record for the GCMS employed in this case,[9] and (3) records regarding Mayo's proficiency testing.[10] Therefore, our analysis in this case is restricted to the items from the motion to compel so narrowed.[11]

 Discovery questions generally "involve a very broad discretion that is to be exercised by the trial courts. Their determinations will be disturbed on appellate review only if there is an abuse of discretion." *North River Ins. Co. v. Mayor and City Council of Baltimore*, 343 Md. 34, 47, 680

---

8. In Petitioner's Brief and at oral argument, Cole conceded that several of the twenty-six requests in his motion to compel in the Circuit Court were overbroad. In his brief, Cole specifically alleged error only as to the following items:

 the instrument conditions for the GC/MS, including all temperature records, any specific columns which were used, and the source, nature, content and testing with regard to any solvent or carrier gas which was used in this case (item 11); record of the operating conditions and criteria for variables in the GC/MS, including tuning criteria, initial calibration and continuing calibration checks (item 22); the Lab's written protocols, standard operating procedures, methods, and Quality Assurance manual (however named).

 We interpret "the Lab's written protocols, standard operating procedures, methods, and Quality Assurance manual," along with the "the standard operating procedures including the quality assurance manual, in general" (mentioned at oral argument), to include parts of items numbered five, ten, twelve, and twenty-six from the motion to compel. Along with items numbered eleven and twenty-two, that totals six requests related to operating procedures.

9. Cole's twenty-fourth numbered request was for "[r]ecords of calibration checks and mass traceability for gravimetric determinations[.]" This does not appear to have been limited in the trial motion to the machine or those machines actually used to analyze the substances in this case, but rather appears to have been directed generally toward all of the instruments in the laboratory.

10. The third numbered item Cole requested in his motion to compel was "[t]he results of any proficiency tests given to each chemist or analyst employed by the Prince George's County Drug Laboratory[.]"

11. We perceive no preservation question as to Cole's narrowed appellate contentions. Even were such a question fairly raised, we would exercise our discretion to consider these contentions. *See Crown Oil & Wax Co. of Del., Inc. v. Glen Constr. Co. of Va., Inc.*, 320 Md. 546, 560–63, 578 A.2d 1184, 1190–92 (1990).

A.2d 480, 486–87 (1996). "[A] trial court's factual findings are not upset unless clearly erroneous." *Williams v. State*, 364 Md. 160, 169 n. 9, 771 A.2d 1082, 1087 n. 9 (2001). The application of the Maryland Rules, however, to a particular situation is a question of law, and "we exercise independent *de novo* review to determine whether a discovery violation occurred." 364 Md. at 169, 771 A.2d at 1087. Where a discovery rule has been violated, the remedy is, "in the first instance, within the sound discretion of the trial judge. The exercise of that discretion includes evaluating whether a discovery violation has caused prejudice. Generally, unless we find that the lower court abused its discretion, we will not reverse." 364 Md. at 178, 771 A.2d at 1093–94. (citations omitted). *See also Collins v. State*, 373 Md. 130, 816 A.2d 919 (2003) (the trial court abused its discretion by failing to remedy a violation of Rule 4–263(a)(2)(C)); *Fisher v. State*, 367 Md. 218, 786 A.2d 706 (2001) (Where the defense, citing Rule 4–263(b)(1), had requested information regarding the current location of a child witness, the Court found "ample good cause for the [trial] court's conclusion that the secure and protected environment of this child should not be invaded. There was no abuse of discretion.").

## III.

The resolution of discovery disputes generally is driven by how two inquiries are answered: (1) is the information or documents sought of a kind that is discoverable under the governing law or rules and (2) is the information or documents sought relevant to the subject matter of the case? In the civil context, these two questions are merged into just the second question. According to Md. Rule 2–402(a), "[a] party may obtain discovery regarding any matter, not privileged, ... if the matter sought is relevant to the subject matter involved in the action." A party may not object to a discovery request on the ground that "the information will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Md. Rule 2–402(a).

■ There are no equivalent rules of criminal procedure to Rule 2–402(a). Because no rule provides for the general discovery of all relevant material, the two inquiries remain distinct in the criminal context. In order to show a given document or item of information is discoverable, a defendant must show that the governing law makes that type of document or information available and that the information or document is relevant to the subject matter of the case.

## A.

Cole's primary argument is that he was unconstitutionally denied due process when the State refused to give him the information and documents he requested and the trial court refused to compel discovery of that information and documents and essentially excluded the testimony of his expert witness for want of the desired disclosures.[12] We need not decide the challenge on a constitutional basis because we conclude that the Maryland Rules require the State to provide the defense, upon request, the documents and information sought here, as narrowed by Cole before this Court, so that the defense may endeavor to understand the nature of any scientific testing where the State intends to introduce the results of those tests at trial.

■ Just as "trial judges have no power beyond that conferred by Rule 4–261 to order depositions in criminal trials," *Tharp v. State,* 362 Md. 77, 115, 763 A.2d 151, 171 (2000), trial judges have no power beyond that conferred by Rule 4–263 to order discovery of tangible evidence or documents in the State's possession. "[E]ven though we have expanded the common law and given trial courts some authority to either require or permit discovery, the right to pre-trial discovery is strictly limited to that which is permitted by

---

12. Cole does not allege that the information and documents he requested is "evidence favorable to the accused" that must be disclosed without request. *U.S. v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985); *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

statute or court rule or mandated by constitutional guarantees." *Id.* (citations and formatting omitted).

■ Discovery related to scientific tests conducted by prosecution experts is controlled by Rule 4–263(b)(4).[13] The general objectives of Maryland's criminal discovery rules are to assist the defendant in preparing his or her defense and to protect the accused from unfair surprise. *See Mayson v. State,* 238 Md. 283, 287, 208 A.2d 599, 602 (1965) (discussing former Maryland Rule 728, a precursor to Rule 4–263). The purpose of Rule 4–263(b)(4) is to allow the defense to prepare for expert testimony. Defense counsel cannot prepare to evaluate or challenge a State expert's qualifications or testimony without an understanding of what tests the expert performed and how the expert performed them.[14] For this reason, no one disputes that the procedures such an expert actually employs are discoverable. In this case, Cole was allowed to examine the State's chemist in the course of a pretrial motions hearing so as to determine what tests she performed and how she performed them. The question remaining is what further information Cole was entitled to receive, upon request, under the rule.

The operations of the Prince George's County Police Drug Analysis Laboratory generally are shielded from outsiders. The lab is inaccessible to anyone who is not a member of law

13. "Upon request of the defendant, the State's Attorney shall ... [p]roduce and permit the defendant to inspect and copy all written reports or statements made in connection with the action by each expert consulted by the State, including the results of any physical or mental examination, scientific test, experiment, or comparison, and furnish the defendant with the substance of any such oral report and conclusion."
Md. Rule 4–263(b).

14. Expert testimony relating to scientific testing is not admissible unless the tests the expert ran are reliable. *See Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978) (adopting the *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) standard for reliability). When performed correctly, infrared spectrophotometry and GCMS testing generally are considered throughout the scientific community to be very reliable methods of determining the nature of an unknown chemical substance.

enforcement, and the lab is not independently certified or audited.[15] Controlled dangerous substances (CDS) may only be tested by certified chemists and certified analysts. Only members of law enforcement may apply to become certified chemists or certified analysts. COMAR 10.10.09.01(A)(3) and (B)(3). There is no provision in Maryland statutes, regulations, or rules for the independent testing of suspected CDS in criminal cases.[16] Given that no outsider may observe testing within the laboratory, it is understandable that the defense would seek to obtain the lab's standard operating procedures in order to evaluate the sufficiency of those procedures and determine if they were followed in the tests actually performed in a given case.

We conclude that Rule 4–263(b)(4) extends to written standard operating procedures intended to be employed by a State's drug analysis expert or lab when those procedures are relevant to a given case. Standard operating procedures are an important part of expert testimony because, like habit evidence, *see* Md. Rule 5–406, they tend to prove that the conduct of the expert on a particular occasion was in conformity with the written standard operating procedures. Should an expert testify that she or he followed the procedures in a given case, then the defense would understand how the tests were performed. If the testimony, however, revealed that the standard operating procedures were not followed, that might be exculpatory evidence which, when brought out in cross-examination, could make a meaningful difference to a fact-finder. *See Commonwealth v. Brosnick*, 530 Pa. 158, 607 A.2d

---

**15.** As noted *supra* at n. 6, the trial court denied a defense motion for an independent audit. That decision was not attacked in Cole's brief or argument before this Court.

**16.** *Cf.* Md.Code (1982, 2000 Repl.Vol., 2002 Cum. Suppl.) § 17–214(e)(1) of the Health–General Article ("[a] person who is required to submit to job-related [alcohol or CDS] testing ... may request independent testing of the same specimen for verification of the test results"); COMAR 10.10.10.07(B) ("A person collecting a specimen [for job-related alcohol or controlled dangerous substance testing] shall collect a quantity sufficient to perform an initial screening test, a confirmation test, and an independent test.").

725 (1992) (evidence discovered after trial that the State apparently had not complied with its own regulations regarding alcohol testing resulted in a new trial).

Access to laboratory information generally is significant for another reason. The validity of testing procedures and principles is assessed in the scientific community by publishing the data in peer review journals.... [P]ublication of a laboratory's work product and data used in [scientific] analysis, as well as independent replication and validation studies, are essential prerequisites to reliability.

*State v. Schwartz,* 447 N.W.2d 422, 427–28 (Minn.1989) (a DNA testing lab's test results were deemed inadmissible because the lab did not comply with appropriate standards and controls or make its testing data and results available). *See generally McIlwain v. State,* 700 So.2d 586, 590 (Miss. 1997) ("A chemical analysis ... is deemed valid only when performed according to approved methods; performed by a person certified to do so; and performed on a machine certified to be accurate.... Where one of the safeguards is deficient the State bears the burden of showing that the deficiency did not affect the accuracy of the result."); *State v. Mehl,* 602 So.2d 1383, 1387 (Fla.App.1992) (the state followed administrative rules for testing blood alcohol content, and was therefore entitled to a presumption of accuracy).

▪ Both the infrared spectrophotometer and the GCMS operate by comparing suspected CDS to a known calibration sample. For this reason, calibration records are essentially part of the test results. Although Mayo's testimony was not received formally as that of an expert in chemistry, she was allowed to give opinion testimony and the record indicates that she was viewed by both the trial judge and the jury as an expert in testing for CDS. Her qualifications, including her record in proficiency tests, also are relevant to the weight the fact-finder might give the test results based on its assessment of her competency. This kind of written information is eligible generally for discovery when it is relevant in a given case.

## B.

The trial court found that "[Petitioner] has not met his burden which is to convince me that Items 1–6 and 9–26 [in his motion to compel] are relevant to this case." At trial, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. The word "relevance," as used in Rule 5–401, includes what previously was meant by the terms "relevance" and "materiality." *Smith v. State*, 371 Md. 496, 504 n. 1, 810 A.2d 449, 454 n. 1 (2002). "Evidence that is not relevant is not admissible." Md. Rule 5–402. This does not mean, however, that information or documents that do not pass the Rule 5–402 test for relevance in and of themselves are not *discoverable*.

The word "relevance" has a different meaning in the discovery context from its meaning in the trial context.[17] The issue at trial is admissibility of offered evidence, while the issue in pre-trial stages is whether a party may obtain information or documents through discovery. This distinction is made clearest in the civil setting. "A party may obtain discovery regarding any matter, not privileged, ... if the matter sought is relevant to the subject matter involved in the action." Rule 2–402(a). A party may not object to a discovery request on the ground that "the information will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* This is in stark contrast to the "two paramount rules of evidence" that guide a court in determining whether evidence is admissible at trial: "[E]vidence that is not

---

17. Rule 4–263(a)(2) is an exception. In that provision, "relevance" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See Warrick v. State*, 302 Md. 162, 170–71, 486 A.2d 189, 193 (1985) ("the information must be relevant. This is the same limitation which courts traditionally apply and which turns on the legal issues under the facts and circumstances of the case.")

relevant to a material issue is inadmissible ... [and] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Smith,* 371 Md. at 504, 810 A.2d at 454. Although no rule provides generally for the discovery of all relevant information and documents in the State's possession or control in criminal cases,[18] irrelevant matters clearly are not discoverable.[19] When relevance is at

---

**18.** This was not always the case. Former Maryland Criminal Rule 5, which became former Maryland Rule 728, applied generally to all relevant materials held by the State:

> Upon motion of a defendant, the court, in any case pending before it, may order the State's Attorney to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, including written statements by the defendant, obtained from or belonging to the defendant or obtained from others by seizure or process, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable.

Maryland Criminal Rule 5 (as amended in 1951). In 1961, the Court of Appeals eliminated this general language by amending Rule 728 to limit the defendant's access to evidence from the State to objects belonging to the defendant or obtained from others by seizure or by process, the defendant's own statements, and the names of witnesses the State intended to call. The 1961 amendment retained some judicial flexibility by adding "[n]othing in this Rule shall limit the inherent common law power of the court to require or permit discovery." Former Md. Rule 728 (as amended in 1961). In 1977, the Court adopted former Rule 741, which was substantially similar to current Rule 4–263. That Rule eliminated the common law clause, strictly limiting the defendant's access to discovery from the State to its enumerated list of discoverable items.

**19.** We previously have required the demonstration of a likelihood of obtaining information relevant to the defense, *Thomas v. State,* 372 Md. 342, 359, 812 A.2d 1050, 1060 (2002); *Goldsmith v. State,* 337 Md. 112, 128, 651 A.2d 866, 874 (1995), and we have said that the defendant is not "required to show that the request [is] reasonable or the item sought [is] material to the preparation his defense" in order to obtain those items listed in Rule 4–263(a) or (b). *Williams v. State,* 364 Md. 160, 171, 771 A.2d 1082, 1088 (2001). *See also Patrick v. State,* 329 Md. 24, 617 A.2d 215 (1992) (the State was required, under Rule 4–263(b)(4), to provide the defense the results of all polygraph tests it conducted even if that information was not independently relevant). This apparent conflict is caused by the different meanings of the word "relevance" noted above. A defendant need not demonstrate that the sought after information or documents meets the Rule 5–402 test for

issue in criminal discovery disputes, the standard is the same as for civil actions: ordinarily the information or documents should be deemed relevant if it reasonably is calculated to lead to the discovery of admissible evidence and their probative value is not outweighed by any privacy interests, confidentiality, privilege, or other conflicting interest, including the burden of production.

To support its rejection of the motion to compel in the present case, the trial court relied on an improper interpretation of *Zaal v. State*, 326 Md. 54, 602 A.2d 1247 (1992). In *Zaal* we weighed the competing interests of a witness's privilege and a defendant's right to obtain and present evidence necessary for his defense. The defendant in *Zaal* was charged with sexually abusing his granddaughter. He sought access to her confidential school records for the purpose of acquiring impeachment evidence with which to rebut her accusations. The trial court conducted an *in camera* review of the school records, without counsel present, and "noted that its review did not reveal 'anything that would appear to set forth any kind of evidence that would be directly admissible in this proceeding.'" 326 Md. at 63, 602 A.2d at 1251. We reversed, holding that in such cases "a trial judge, in the exercise of discretion, must conduct a balancing test in which the privacy interest of the student is weighed against the genuine need of the party requesting the information for its disclosure. Disclosure is permitted when the need for it outweighs the privacy interest of the student or his or her parents." 326 Md. at 72, 602 A.2d at 1256 (citations omitted). Applying the test to the facts in that case, we found that "controlled access by counsel to the records" was appropriate. 326 Md. at 88, 602 A.2d at 1264. We further noted that, when a court conducts an *in camera* review without counsel present, "[t]he trial court's review should not only be aimed at discovering evidence directly admissible but also that which is usable

relevance, only that its potential probative value outweighs any burden on the State in producing the desired materials.

for impeachment purposes, or that which would lead to such evidence." *Id.*

We since have faced similar issues in *Robinson v. State,* 354 Md. 287, 730 A.2d 181 (1999) and *Goldsmith v. State,* 337 Md. 112, 651 A.2d 866 (1995). In *Robinson,* we held that Rule 4–263 required the disclosure of certain police internal affairs documents to a defendant despite the confidentiality requirements attached to those documents under the Law Enforcement Officers' Bill of Rights.[20] In *Goldsmith,* we held that the trial court properly had denied the defendant's request, under Rule 4–264, to depose the victim's private psychotherapist. In both cases we applied the balancing test laid out in *Zaal. See also Thomas v. State,* 372 Md. 342, 358–59, 812 A.2d 1050, 1060 (2002) (defendant did not proffer how certain psychiatric records relating to an admission that occurred 13 years prior to the incident at issue were relevant, so the trial court did not abuse its discretion in declaring them irrelevant); *Fisher v. State,* 367 Md. 218, 786 A.2d 706 (2001) (State refusal to disclose the whereabouts of a child-witness who had been the victim of child abuse at the hands of defendants was not a violation of Rule 4–263(b)(1) where the witness unequivocally expressed unwillingness to speak with defense representatives.).

The trial court in the present case believed that *Zaal* required it "to find a 'likelihood that relevant information will be obtained as a result of reviewing the records.'" (quoting *Zaal,* 326 Md. at 82, 602 A.2d at 1261). This is the product of a faulty recollection. The pertinent full quotation from *Zaal* is: "To overcome a privacy interest in those records, some relationship must be shown between the charges, the information sought, and the likelihood that relevant information will be obtained as a result of reviewing the records." 326 Md. at 81–82, 602 A.2d at 1261. There is no indication of any

---

**20.** Then codified at Md.Code (1957, 1992 Repl.Vol., 1995 Cum.Supp.), Article 27, §§ 727 to 734B, the Law Enforcement Officers' Bill of Rights is now located at Md.Code (2003), §§ 3–101 to 3–113 of the Public Safety Article.

conflicting interest in the present case equivalent to the child's privacy interest in *Zaal.* We made clear in *Zaal* that relevant public records should normally be discoverable "when privacy interests are not overriding." 326 Md. at 77, 602 A.2d at 1258–59. *See also Harris v. State,* 331 Md. 137, 161, 626 A.2d 946, 958 (1993) ("a party to ongoing litigation may subpoena, without advance notification having to be given to the other party, a third party's records for use at the trial. When, however, the records sought are 'confidential', before disclosure will be ordered, the moving party must show, usually at a hearing, some connection between the records sought, the issue before the court, and the likelihood that information relevant to the trial would be discovered.")

██ The test for relevance, and the standard we employed in *Zaal,* is a balancing test where the court weighs the potential probative value of the information or documents sought against the potential burden on the State in production. In performing this balancing test, a court always must keep the applicable standard of proof in mind. Because the State's burden to prove its case "beyond a reasonable doubt" is such a demanding standard, even a small piece of evidence may make a difference to a fact-finder in its analysis.

██ The trial court in this case improperly shifted the burden of proof to the defense. Cole alleged, on a good faith basis, *see* n. 1 *supra,* that the lab's procedures were inadequate, and the trial court ultimately ruled that it was not convinced "by even a preponderance of the evidence, i.e. that it is more likely than not, that the defendant's general allegations are relevant to the case before this [c]ourt." Regardless of such allegations, the defendant was entitled to challenge the accuracy of any test and to understand exactly how the test was performed. He was not required to demonstrate, before even gaining access to the desired information and documents, that the test results were inaccurate or the procedures faulty.

██ The burden on the State in providing the requested information is far outweighed by its potential probative value. There was no argument made by the State in the record of the

present case of privacy interests, confidentiality, privilege, or any of the other conflicting interests addressed in cases like *Zaal.* The only burden on the State appears to be the burden of physically delivering the documents and information.[21] While such a small burden usually will outweigh a defendant's request for irrelevant information, which by definition has no potential probative value, it is not sufficient to overcome Cole's interests in learning the procedures employed by the laboratory that analyzed the substances in his case. In any case where the nature of an asserted CDS is in dispute, the State must demonstrate that its chemical analysis was accurate.[22] *See State v. Rowell,* 517 So.2d 799, 802 (La.1988) ("the state failed to meet its burden of proving that the regulations insured the integrity and reliability of blood alcohol analyses because they did not contain provisions for repair, maintenance, inspection, cleaning, certification and chemical accuracy"). Cole's right to challenge this analysis outweighs any burden on the State in providing him with its standard operating procedures and manuals.

■ The calibration record for the machine the chemist used and the chemist's own proficiency testing records with regard to the specific testing devices and written procedures

---

21. The burden could be assuaged partially by allowing defense counsel to examine the documents where they are located currently. During oral argument, Cole's appellate counsel suggested an alternative where single copies of the lab's standard operating procedures and other such manuals even could be delivered to the public defender's office and/or the local Bar Library for examination by interested members of the private defense bar, as needed, thus eliminating the need to provide this information individually in each case where it might be sought. These master copies would need be annotated only as changes occur.

22. A defendant accused of possession of a CDS is entitled to demand that the State present as a witness the chemist or analyst who tested the substances. Md.Code (1973, 2002 Repl. Vol) § 10–1003 of the Courts and Judicial Proceedings Article. If the defendant does not demand the presence of the chemist or analyst who tested the substances, then the prosecution may submit the chemical test report submitted by the chemist or analyst who tested the substances without the presence of the chemist or analyst. § 10–1001. That report is considered prima facie evidence that the substances were properly tested and that they were of the nature described in the report. *Id.*

are potentially relevant to the case because an improperly calibrated machine or a machine operated by a chemist who was not proficient in its use could lead to an inaccurate result. Cole was not required to demonstrate that the machine was improperly calibrated or that the chemist's proficiency testing record was less than satisfactory in order to obtain the information by which he might substantiate such allegations. Cole's general allegations may not have been admissible at trial, but, because a defendant may compel the State to prove its case, he was entitled to obtain portions of the requested items to which he now maintains an interest.

## IV.

If Cole had requested originally and solely "the standard operating procedures including the quality assurance manual, in general, the calibration record that went to the GCMS [actually used in this case], and the proficiency testing record for the chemist, Mayo" during discovery and in his motion to compel, he would have been entitled to that information. Instead, Cole's motion to compel sought, *e.g.*, "*All materials* listing the drug-identification procedures used by the Prince George's County Drug Laboratory pursuant to COMAR 10.10.03.07" (item 5) (emphasis added), "Results of calibration checks and mass traceability for gravimetric determination" (item 24), and "The results of any proficiency tests given to *each chemist or analyst* employed by the Prince George's County Drug Laboratory" (item 3) (emphasis added). These requests, apparently directed toward every machine in the lab, every test the lab was capable of performing, and every chemist or analyst employed by the lab, clearly were overbroad.[23]

---

**23.** Defense attorneys may not demand information or documents in discovery "unless there is a basis for doing so that is not frivolous." Maryland Rule, 16–812, Maryland Rules of Professional Conduct (MRPC) for Lawyers, Rule 3.1. As has now been conceded, many of Cole's original requests were overbroad, though not necessarily frivolous (*see* n. 1, *supra* ), because they were not reasonably calculated to lead to the discovery of admissible evidence.

Although the lab's procedures related to every suspected CDS that it tests are not all relevant in the present case, its standard procedures related to cocaine testing are relevant. Although the calibration records for every machine in the laboratory are not relevant in the present case, the calibration records for the equipment used to test the samples from this case are relevant. Although the proficiency testing records for every chemist or analyst employed by the lab are not relevant here, Mayo's proficiency testing records as to the equipment and written procedures she used here are relevant.[24] We conclude, therefore, that Cole was entitled to those

---

The parties followed the procedures prescribed in the Maryland Rules for resolving discovery disputes in criminal cases in a circuit court. Before filing the motion to compel, Cole and the State engaged in good faith discussions in an effort to resolve the dispute. When those discussions proved unavailing, Cole filed a certificate as to the specifics of the good faith discussions. *See* Md. Rule 4–263(f):

The court need not consider any motion to compel discovery unless the moving party has filed a certificate describing good faith attempts to discuss with the opposing party the resolution of the dispute and certifying that they are unable to reach agreement on the disputed issues. The certificate shall include the date, time, and circumstances of each discussion or attempted discussion.

At the ultimate hearing on Cole's motion to compel, Cole bore the burden to convince the hearing judge that the documents and information sought from the State were relevant to the case (*See* Opinion and Order of Court, dated 20 September 2000, at page 6, where the hearing judge stated, "[a]fter reviewing the record, including a hearing on this issue held September [14], 2000, I find that Defendant has not met his burden which is to convince me that Items 1–6 and 9–26 are relevant to this case," and at page 7, "I can only conclude that Defendant's request is not likely to lead to relevant information."). Although we obviously disagree to some extent with the conclusion reached in the Circuit Court, the procedures followed there ultimately in presenting and deciding the discovery dispute in this case were appropriate. Following these procedures, and with the possible "stick" of MRPC 3.1 available, the prevention or remediation of abuses of discovery requests in criminal cases can be maximized.

24. Although the record is not crystal clear on this point, it may well be that the laboratory does not maintain any written proficiency testing records regarding Mayo. Mr. Porter, the manager of the lab, testified that he occasionally conducted single-blind, but not double-blind, proficiency tests of his chemists. He also occasionally re-checked samples that his chemists had tested. Whether written records of these tests, or any other proficiency tests, are maintained is unclear.

parts of the narrowed eight discovery requests addressed in his brief, as further narrowed at oral argument before us.

## V.

 Having concluded that the State's failure to provide to the defense the information described above was a violation of Rule 4–263 and that the trial court abused its discretion in granting the motion to compel only as to two of the listed items when Cole was entitled to parts of eight additional items, we must reverse unless we are able to declare, beyond a reasonable doubt, that the error in no way influenced the verdict. *Williams v. State*, 364 Md. 160, 179, 771 A.2d 1082, 1093 (2001).

Even without the additional information we conclude that Cole was entitled to receive in discovery, James Slunt, his expert chemist, was prepared to testify for the defense that he was not convinced to a reasonable degree of scientific certainty that the seized substances Mayo tested had not been contaminated or that they were in fact cocaine. Had Slunt been given access to the additional information, he may have acquired the requisite factual predicate upon which to base his opinions about the lab's and/or Mayo's procedures and thereby been allowed to testify. If the information supplied in response to discovery reasonably would have allowed him to conclude that the testing procedures were insufficiently reliable to assure an accurate result, his testimony may have changed the outcome in the case. Credible identification of the substances as a CDS were at the core of the State's charges. Cole must receive a new trial.

JUDGMENT REVERSED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.