*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CM-356

ANTWAN BUCHANAN, APPELLANT,

08/03/2017

FILED
District of Columbia
Court of Appeals

*Julio Castillo*
Julio Castillo
Clerk of Court

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-13296-14)

(Hon. William M. Jackson, Trial Judge)

(Argued December 15, 2016               Decided August 3, 2017)

*Donald Burke*, with whom *Matthew M. Madden* was on the brief, for appellant.

*Priya Naik*, Assistant United States Attorney, for appellee. *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *Kathleen A. Kern*, and *Melissa M. Price*, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON and MCLEESE, *Associate Judges*, and FERREN, *Senior Judge*.

THOMPSON, *Associate Judge*:    Appellant, Antwan Buchanan, was arrested after police officers saw him drop a duffle bag and another grocery-type bag as he was fleeing from police officers who had asked to speak with him.  When officers retrieved and searched the bags, they found 7.5 ounces of a plant-like substance

they believed to be marijuana, two scales, over 200 empty zip-lock bags, sandwich bags, a nail file, and a plastic lid. The plant-like substance, which was contained in one small and two large zip-lock bags and which field-tested positive for THC,[1] was sent to a Drug Enforcement Administration ("DEA") laboratory for testing. On this evidence, the government charged appellant with possession with intent to distribute a controlled substance (marijuana), *see* D.C. Code § 48-904.01 (a)(1) (2012 Repl.), and possession of drug paraphernalia, *see* D.C. Code § 48-1103 (a) (2012 Repl.). After a bench trial, he was convicted of both offenses.

Prior to trial, appellant sought discovery under the rule now codified as Super. Ct. Crim. R. 16 (a)(1)(E) ("Rule 16 (a)(1)(E)").[2] The Superior Court judge, the Honorable William M. Jackson, compelled the government to produce documents in response to some of appellant's discovery requests but denied appellant's motion to compel production in response to other requests. In this appeal, appellant argues that the court erred in certain of its rulings denying his discovery requests. He asks us to require the government to produce the

[1] THC "is the active ingredient in marijuana." *Lesher v. United States*, 149 A.3d 519, 522 (D.C. 2016) (internal quotation marks omitted).

[2] An April 2016 amendment to the Superior Court Rules of Criminal Procedure moved the provision formerly contained in Rule 16 (a)(1)(C) to Rule 16 (a)(1)(E) but made no substantive change to the content of the rule. In this opinion, we cite to the current codification.

documents in question and to remand for the trial court to review the documents and determine whether appellant was prejudiced by the non-disclosure. We conclude that appellant is entitled to this relief with respect to some of the categories of documents in question and, as to other categories, is at least entitled to have the trial court reconsider the requests in light of "all relevant factors and no improper factor."[3]

## I.

DEA senior forensic chemist Nicole Edwards performed the chemical analysis of the plant-like substance. In his initial discovery requests, appellant sought "the complete case file of the chemist who was responsible for testing the suspected marijuana recovered in this case." The government provided Edwards's case file to appellant on November 8, 2014, ten days prior to the scheduled trial date. The documents produced included, *inter alia*, the chemical analysis report (DEA-113) and the forensic chemist worksheet (DEA-86), as well as "bench notes, memoranda, evidence reports, chain of custody reports (DEA-12), negative and positive control data, chrom[a]tographs, mass spectra, photographs of [the]

_____

[3] *In re R.M.G.*, 454 A.2d 776, 790 (D.C. 1982) (citing *Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979)).

evidence, and the results of any color tests and microchemical crystal tests." The government also produced information about the make and model of the equipment used to test the substance and the "scope of accreditation" document for the DEA laboratory. Upon receipt of this information, appellant moved to continue the trial date in order to confer with his own expert chemist. Judge Jackson set a new trial date.

On December 16, 2014, appellant moved to compel the production of additional documents he had requested. As pertinent here, he sought to compel the government to produce (1) "the standard operating procedures [("SOPs")] used in the DEA lab," (2) "validation studies relating to those procedures," (3) "maintenance and calibration records for the equipment used by the DEA lab," (4) "audit reports on the operations of the DEA lab," (5) "training materials used by the lab," and (6) "proficiency examinations and performance evaluations for the chemist who had tested the suspected marijuana." In support of his request, appellant submitted the affidavit of Heather Harris, a "forensic chemistry consultant and adjunct professor of forensic science employed by Arcadia University in Glenside[,] [Pennsylvania]." Harris averred that she needed to review the documents appellant sought "to ensure that the [DEA] analyst came to the proper conclusion [regarding the evidence] and that the conclusion is

scientifically supported by the analytical results" and asserted that it was "impossible to evaluate the validity and reliability of [the DEA] analysis without this documentation."

In its written opposition to appellant's motion, the government agreed to provide "the DEA Laboratory Order regarding the Analyses of MPDC Evidence (DEA-42)" (the "Laboratory Order") on condition that appellant sign a non-disclosure agreement. The government rejected appellant's requests for other documents on grounds that their acquisition was unduly burdensome or beyond the reach of Rule 16 (a)(1)(E). Appellant filed a reply memorandum in support of his motion to compel, to which he attached a second affidavit from Harris.

In a written ruling dated February 27, 2015, Judge Jackson said that the government would be required to produce the DEA laboratory SOPs "[t]o the extent that the DEA Laboratory Order does not encompass DEA's standard procedures and guidelines for testing marijuana," as well as the DEA laboratory accreditation reports "[t]o the extent that the [DEA laboratory's] accreditation is not publicly available." Judge Jackson rejected appellant's requests for the remaining documents.

Upon the judge's ruling, appellant filed a second motion to compel, arguing that the government had failed to comply with the court order requiring the government's disclosure of the DEA's SOPs. The motion was accompanied by a third affidavit from Harris. Judge Jackson denied the motion from the bench, reasoning that appellant would be able to call the chemist as a fact witness about the laboratory's operating procedures.

The case proceeded to trial on March 30, 2015. The government had Edwards available to testify in its case-in-chief, but before she took the stand, appellant's trial counsel "stipulated to the admissibility of the DEA-7 and the findings that have been made within." Accordingly, Edwards did not testify at trial (and thus was not cross-examined). The DEA-7 that was admitted into evidence revealed that Edwards had weighed the plant-like substance and performed three different types of tests — a microscopic inspection, a gas chromatography/mass spectrometry ("GC/MS") test, and a Duquenois-Levine ("D-L") color test — to determine whether the substance was marijuana. Her report indicated that all three tests were positive, leading Edwards to conclude that the sample "contained 'a measurable amount of [m]arijuana.'"

In addition to the DEA-7, the government's evidence at trial included the testimony of a police detective to the effect that the amount of marijuana found in the bags appellant discarded was consistent with intent to distribute and inconsistent with possession for personal use. The detective also testified that the scale, nail file, small zip-lock bags, and other items found in the bag are tools commonly used to separate and package drugs for distribution.

## II.

Appellant now challenges the trial court's denial of his motion to compel production of the six categories of withheld documents described above. Relying on Rule 16 (a)(1)(E), appellant argues that the trial court erred by denying his discovery requests where they "were supported by unrebutted expert affidavits specifically identifying the potential for error in the testing methods employed by the government's chemist, the defense's need for the requested information, and the absence of any likely burden on the government."[4] The government argues that

---

[4] Appellant argues that "[t]he appropriateness of [his] discovery requests" is "underscored by the rules governing the [District of Columbia] Consolidated Forensic Laboratory, which would make most of what [he] sought in this case either a public record or subject to automatic disclosure if the testing at issue in this case had been conducted" at that laboratory. He cites D.C. Code § 5-1501.06 (h)(2) (2012 Repl.), providing that the defense will receive a copy of "records,"

(continued…)

appellant is not entitled to the relief he requests because he (1) failed to establish that the materials in dispute were material to his defense, (2) stipulated to the analysis and findings of the DEA chemist and thus forwent opportunities to challenge the government's forensic evidence at trial, (3) declined to call his expert to testify about the alleged errors committed by the DEA chemist, and (4) failed to demonstrate that he was prejudiced by the court's denial of his requests.

"We review the trial court's discovery rulings for abuse of discretion, but we consider the proper construction of [Rule 16 (a)(1)(E)] *de novo*." *Watson v. United States*, 43 A.3d 276, 283 (D.C. 2012) (citations omitted). If we conclude that the trial court erred or erroneously exercised its discretion in not compelling the requested document production under Rule 16, we must "turn to the more difficult

---

(…continued)

defined to include, *inter alia*, "[a]ny logs related to the equipment or materials used in testing" and "[p]roficiency test results for individual examiners involved in the analysis." *Id.* § 5-1501.06 (h)(3)(G), (I). He cites in addition § 5-1501.06 (i)(2), which declares to be "public" a set of materials that include the laboratory's "[p]rotocols for forensic testing, examination, and analysis[,]" its "[p]rocedures for monitoring the quality of forensic analysis[,]" and its "[i]nternal validation studies." *Id.* § 5-1501.04 (b)(l), (5), (9). Appellant acknowledges that these rules are not binding on the DEA, but argues that they reflect the judgment of the Council of the District of Columbia "that criminal defendants should have broad access to information about potential sources of error in the forensic evidence the government seeks to offer against them[.]" These rules may also be germane to whether producing such records in discovery is unduly burdensome.

questions as to whether [appellant] was prejudiced by the government's failure to comply with Rule 16, [and] whether that failure warrants reversal of [his] convictions and a new trial." *Ferguson v. United States*, 866 A.2d 54, 65 (D.C. 2005).

"Rule 16 [(a)(1)(E)], which governs pretrial discovery, confers [on] an accused the right to discover specific information within the government's control, such as books, papers, documents, photographs . . . *which are material to the preparation of the defendant's defense . . . .*" *Watson*, 43 A.3d at 283 (emphasis added) (internal quotation marks omitted). To establish that the documents are material, a defendant must show "a relationship between the requested evidence and the issues in the case, and there must exist a reasonable indication that the requested evidence will either lead to other admissible evidence, assist the defendant in the preparation of witnesses or in corroborating testimony, or be useful as impeachment or rebuttal evidence." *United States v. Curtis*, 755 A.2d 1011, 1014–15 (D.C. 2000). "A defendant must make a threshold showing of materiality, which requires a presentation of facts which would tend to show that the [g]overnment is in possession of information helpful to the defense." *Id.* at 1015 (internal quotation marks omitted). "The threshold showing of materiality is not a high one." *Id.* "However, neither a general description of the information

sought nor conclusory allegations of materiality suffice." *Id.* (internal quotation marks and brackets omitted). Federal courts have held that the defense "must show more than that the item bears some abstract logical relationship to the issues in the case . . . . There must be some indication that the pretrial disclosure of the item would . . . enable the defendant significantly to alter the quantum of proof in his favor[,]" *United States v. Jordan*, 316 F.3d 1215, 1251 (11th Cir. 2003) (internal quotation marks and brackets omitted), and that "the requested discovery [must have] relevance to . . . *the defendant['s] particular case*." *United States v. Soto-Zuniga*, 837 F.3d 992, 1001 (9th Cir. 2016) (emphasis added); *see also id.* at 1003 (explaining that the test is "whether the discovery may assist [the defendant] in formulating a defense").[5] Documents that "refute the [g]overnment's arguments that the defendant committed the crime charged" fall squarely within the Rule. *United States v. Armstrong*, 517 U.S. 456, 462 (1996). A defendant's "request for discovery materials must be reasonable and may not unduly burden the government." *Curtis*, 755 A.2d at 1016 (citing *Wiggins v. United States*, 521 A.2d 1146, 1148 (D.C. 1987)).

---

[5] "Because [Super. Ct. Crim. R.] 16 is substantially the same as its federal counterpart . . . , it is to be construed consistently with the federal rule[,] and we may look to relevant federal precedents for guidance." *Curtis*, 755 A.2d at 1014 (internal quotation marks omitted).

In *Curtis*, the government appealed after the Superior Court granted a motion to dismiss the case for the government's failure to turn over information regarding the "maintenance and repair of instruments used, as well as reports, training materials, and written protocols and procedures relating to the testing of controlled substances that were generated or in use from the time the DEA Lab received the evidence in th[e] case to the time when the analysis was completed." 755 A.2d at 1013. In opposing the defendants' motion to compel, the government had submitted evidence "that the DEA Lab equipment would not give false positive results even if the equipment were not maintained properly." *Id.* at 1015. We reversed (and remanded because the trial court had made no specific findings regarding materiality or burdensomeness), *id.* at 1017–18, but observed that contradictory "information that the failure to properly maintain the lab equipment could lead to inaccurate test results, including false positives, would make the maintenance logs material." *Id.* at 1015 n.8. "Similarly," we observed, "the submission of an affidavit from a qualified chemist that he or she noted a possible flaw in the testing procedures used by the DEA chemist . . . would satisfy the threshold showing of materiality . . . for copies of the training materials and protocols and procedures utilized by the DEA." *Id.* We left it "to the discretion of the trial court to determine what type of threshold showing [was] appropriate" to demonstrate materiality but instructed that the defendants "must make some

preliminary showing of a reason to doubt the chemical analysis provided by the government" and of "some link to a material issue in the case." *Id.* at 1015.

In *Jackson v. United States*, 768 A.2d 580 (D.C. 2001), we reasoned that "[m]ateriality is easily demonstrated" where the government has yet to produce a "detailed description of the tests performed" by the DEA, "broken down to include, among other things, the evidence sampling procedures, qualitative analysis, and quantitation, with the latter differentiated by method [number] and various weight classifications." *Id.* at 583 (internal quotation marks omitted). We explained, however, that where the government has already produced reports on the results of scientific tests done on suspected controlled substances submitted to the DEA for analysis, and where the defense is "demanding still additional background documents related to DEA testing" through a "broad request" that amounts to "a fishing expedition," the *Curtis* "reason to doubt" standard applies, and "the defense w[ill] have to furnish information by affidavit or otherwise contradicting or calling in question the documentation already disclosed before further intrusion into DEA's internal processes w[ill] be sanctioned." *Id.* at 583 & n.2 (emphasis, brackets, and internal quotation marks omitted).

In determining whether a defendant was prejudiced by the denial of a motion to compel the government to produce documents, we must determine the "likelihood that the verdict would have been different had the government complied with the discovery rules or whether the remedy offered by the trial court was inadequate to provide [appellant] with a fair trial." *Ferguson*, 866 A.2d at 65 (internal quotation marks, citation, and brackets omitted). Where we cannot determine the likelihood that the case would have had a different outcome with the requested discovery, the proper course is a record remand "for consideration of the issue by the trial judge . . . , who may make the necessary comparison and transmit [his] findings to us." *Jackson*, 768 A.2d at 584 (citing *Davis v. United States*, 564 A.2d 31, 42 (D.C. 1989) (en banc) (Where this court has "an incomplete record upon which to assess harmlessness," remand is appropriate for the trial court "to make the proper evidentiary record and return the matter to this court.")); *see also Soto-Zuniga*, 837 F.3d at 1002 ("[B]ecause we do not have access to the records in question, we cannot determine the likelihood of whether [the] case would have had a different outcome had [the defendant] been permitted discovery. The proper course under such circumstances is to remand for discovery and an evidentiary determination." (citation omitted)).

**III.**

We now consider in turn each of the categories of documents whose production by the government the trial court declined to compel.

1. <u>The DEA laboratory's standard operating procedures.</u> The first is "the standard operating procedures used in the DEA lab." The court ordered the government to produce the SOPs if they were not "encompass[ed]" in the Laboratory Order. After the government produced the Laboratory Order, defense counsel attempted to explain that the condition the court had established was not satisfied, but, after a brief discussion, the court firmly shut down counsel's argument (saying "[n]ext issue"), apparently without having carefully reviewed the Laboratory Order to ascertain whether it included "a list of standard operating procedures." Harris's third affidavit had explained that the Laboratory Order set out only "general guidance for completing a case" and did not satisfy the request for the DEA laboratory's SOPs because it did not provide "the technical information that is required to replicate the [DEA] testing" and "to fully understand the limitations of the testing."[6] In addition, defense counsel drew the

---

[6] The Laboratory Order addresses, *inter alia*, procedures for receiving a suspected substance from and returning it to the MPD, the proper handling of that

(continued…)

court's attention to the government's transmittal letter attaching the Laboratory Order, but "declin[ing] to provide . . . the [SOPs]" (thus, at least arguably, implicitly acknowledging that the content of the two was not identical). The trial court told counsel that the defense could "call [Harris] . . . as a fact witness to say this is not a standard operating procedure," but that rationale for resolving the issue without further examination overlooked that Rule 16 discovery is to be available for use by the defense "as impeachment . . . evidence," *Curtis*, 755 A.2d at 1015 — here, evidence with which appellant might impeach the DEA chemist.[7]

Although highlighting appellant's representation that Harris would not attempt to replicate the DEA testing "because she no longer worked at a laboratory," the government has not disputed Harris's assertion that she needed to review the SOPs to understand the "limitations of the [DEA] testing." Nor has the

---

(…continued)
substance if it comes in numerous containers, and the method for determining the weight of the substance, but does not describe the DEA's standard procedures for determining whether the substance is marijuana.

[7] *Cf. Cole v. State*, 835 A.2d 600, 609–10 (Md. 2003) ("If the testimony, however, revealed that the standard operating procedures were not followed, that might be exculpatory evidence which, when brought out in cross-examination, could make a meaningful difference to a fact-finder.").

government asserted that production of the SOPs would be burdensome.[8] Accordingly, we agree with appellant that the trial court erroneously exercised its discretion in declining to enforce its order requiring the government to produce documentation "encompass[ing]" the SOPs without a more careful consideration of what, if any, material information its ruling made inaccessible to the defense.[9]

---

[8] Harris's affidavit averred (and the government does not dispute) that the burden associated with producing all of the requested documents is minimal, stating that "[a]ll of this documentation is produced in the normal course of business for a forensic laboratory so the burden of this request is limited to the collection of the relevant documents."

[9] The government urges us to follow "numerous other courts across the country [that] have held that DEA procedures and manuals are not discoverable under federal Rule 16." However, the appellate cases the government cites upheld the denial of discovery under the rule currently codified as Rule 16 (a)(1)(F), which pertains to "Reports of Examinations and Tests." The cases did not hold that production of such documents was not mandated under the rule currently codified as Rule 16 (a)(1)(E) — the rule that governs the instant case. *See, e.g.*, *United States v. Price*, 75 F.3d 1440, 1445 (10th Cir. 1996) (noting that "Price relied almost exclusively on [the rule currently codified as Fed. R. Crim. P. 16 (a)(1)(F)]" and that "[t]he references in Price's motions to [other] subparagraphs . . . of Rule 16 (a)(1) were entirely without detail, and . . . provided no further basis for a ruling"); *United States v. Iglesias*, 881 F.2d 1519, 1521, 1523–24 (9th Cir. 1989) (DEA protocols and the DEA chemist's "log notes" were not discoverable under the rule currently codified as Fed. R. Crim. P. 16 (a)(1)(F).); *United States v. Berry*, 670 F.2d 583, 605 (5th Cir. 1982) (applying the paragraph of Fed. R. Crim. P. 16 pertaining to the "results or reports of . . . any scientific test" (currently codified as Rule 16 (a)(1)(F)) and concluding that the DEA chemist's personal work notes and the "Drug Enforcement Administration Analytical Manual" were irrelevant); *United States v. Orzechowski*, 547 F.2d 978, 984 (7th Cir. 1976) (rejecting the claim that certain DEA internal memoranda were research reports that fell within the rule currently codified as Rule 16 (a)(1)(F)). These cases reflect the intent of the Rule 16 Advisory Committee that "[w]ith

(continued…)

2. <u>The other categories of documents.</u>  In pressing his claim of trial-court error with respect to the other categories of documents whose production the trial court declined to order, appellant relies on Harris's first and second affidavits, in which she "noted a possible flaw in the testing procedures used by the DEA chemist." *Curtis*, 755 A.2d at 1015 n.8.  Specifically, Harris averred that the DEA chemist "used the remaining portion of another test sample" to perform the D-L test and opined that "[t]his is not proper scientific practice and could result in contamination of the sample prior to the D-L test."  Harris also averred that sample contamination "can lead to false positive results."  The government asserts that appellant did not meet his burden of making a "prima facie showing of materiality"

---

(…continued)
respect to results or reports of scientific tests or experiments[,] the range of materials which must be produced by the government is further limited to those made in connection with the particular case."  Fed. R. Crim. P. 16 advisory committee's note to 1966 amendment.

Notably, in *Curtis*, this court agreed that documents concerning the maintenance of DEA laboratory equipment and training manuals do not fall under the rule currently codified as Rule 16 (a)(1)(F), because "they are neither reports of scientific tests or experiments," but we remanded for further proceedings because the trial court "made no specific findings regarding the materiality of the [requested documents]" under the rule currently codified as Rule 16 (a)(1)(E).  755 A.2d at 1017–18.  As discussed above, *Curtis* establishes that where the defendant has produced an "affidavit from a qualified chemist that he or she noted a possible flaw in the testing procedures used by the DEA chemist[,] . . . [such] would satisfy the threshold showing of materiality with respect to . . . protocols and procedures utilized by the DEA," so as to require production under Rule 16 (a)(1)(E).  *Id.* at 1015 n.8.

because his expert Harris "neither cited to a document where such an error was discernible nor . . . explain[ed] how she deduced that such an error occurred" and "did not explain how the use of the same sample to conduct a color test after that sample was viewed under a microscope would undermine the chemist's conclusion." The government provided no evidence to counter Harris's claim about the DEA chemist using "the remaining portion of another test sample," but argues that Harris's affidavit did nothing more than make "conclusory arguments that scientific methods are not infallible" and that "laboratory equipment is capable of failing," which do not meet the *Curtis* standard. *See* 755 A.2d at 1015 ("[C]onclusory allegations of materiality [do not] suffice." (internal quotation marks omitted)).

a. Training materials. The government's "conclusory arguments" response as to the other categories of documents is too general. We conclude that appellant did meet his burden under *Curtis* of establishing materiality with respect to the requested "training materials used by the [DEA] lab."[10] We said in *Curtis* "the

---

[10] The trial court declined to order production of the training materials in a single sentence: "The Court denies defendant's request for training materials." We are unable to discern why the court so ruled. "[A] trial court's action is an abuse of discretion if . . . [it does] not rest upon a specific factual predicate." *Johnson*, 398 A.2d at 364 (citation omitted).

submission of an affidavit from a qualified chemist that . . . she noted *a possible flaw* in the testing procedures used by the DEA chemist . . . would satisfy the threshold showing of materiality . . . for copies of . . . *training materials* and protocols and procedures utilized by the DEA." *Id.* at 1015 n.8 (emphasis added). We did not say that the burden of establishing materiality with respect to such documents could be met only if the qualified chemist said enough about the particular "possible flaw" to establish a prima facie case that the test results were unreliable, or said enough to prove under some standard that the alleged "possible flaw" in the testing procedures used was indeed a flaw. It is enough that the identified "possible flaw," *id.*, "call[ed] into question" the government's evidence (here, the DEA-7 report concluding that the plant-like substance was marijuana) on an issue in the case. *Id.* at 1014, 1015 n.8; *Jackson*, 768 A.2d at 583 n.2.[11] For this reason, we agree that the trial court erred in not requiring the government to produce copies of the training materials used by the DEA laboratory.[12]

---

[11] *See also United States v. Simpson*, 845 F.3d 1039, 1056 (10th Cir. 2017) (concluding that the defendant, who was seeking to suppress the results of a search warrant, did not meet his burden of making "a prima facie showing of materiality" with respect to his discovery request for camera footage that might show that a police informant had lied, because "to justify suppression, [the defendant] needed to attack the veracity of the police affiant, not the informant").

[12] *Cf. United States v. Thomas*, 726 F.3d 1086, 1096 (9th Cir. 2013) (explaining that the government was compelled under Rule 16 (a)(1)(E) to disclose "the handler's log, . . . training records and score sheets, certification records, and

(continued…)

b. <u>Validation studies.</u> The trial court assumed that appellant's request for "validation studies relating to" the DEA laboratory's SOPs — a request that the court characterized as "less than crystal clear" — was a request for "studies validating the methods used in the type of drug testing in this case." The court declined to compel production of such items on the ground that Harris's affidavit did "not call into question the DEA's methods, nor [did] it assert that these methods are different from those widely accepted in the scientific community."

We agree with the trial court that precisely what appellant sought through his reference to "validation studies" was less than clear at the time of the court's February 27, 2015, ruling. However, although Harris's third affidavit attempted to elucidate the request,[13] the court did not revisit the issue after receiving that

_____

(…continued)
training standards and manuals pertaining to [a narcotics-detection] dog," because those materials were "crucial to the defendant's ability to assess the dog's reliability, a very important issue in his defense, and to conduct an effective cross-examination of the dog's handler" (internal quotation marks and brackets omitted)).

[13] Harris explained that "[a] request for validation studies is a request for the proof that the laboratory's analytical tests can perform reliably and generate accurate results"; that "[v]alidation is how the laboratory proves that it is running the tests properly and can generate correct results in its unique environment, on its unique equipment, with its unique people and its specific procedures"; and that

(continued…)

additional information. Further, while Harris "agree[d] with the government that the general techniques that are being used in the DEA Mid-Atlantic laboratory are generally accepted in the community," she averred that "[g]eneral acceptance does not prove that DEA Mid-Atlantic is using those techniques accurately and reliably." The trial court did not appear to consider Harris's explanation about the importance of reliable application of generally accepted methods.[14] For these reasons, we are not satisfied that the trial court properly exercised its discretion when it declined to compel the government to produce the requested validation studies. *See Johnson*, 398 A.2d at 365 ("To exercise its judgment in a rational and informed manner[,] the trial court should be apprised of all relevant factors pertaining to the pending decision[,]" and "[t]he court reviewing the decision for an abuse of discretion must determine whether the decision maker failed to consider a relevant factor[.]" (internal quotation marks omitted)). We conclude

---

(…continued)
"[v]alidation is a series of experiments run in the laboratory to challenge the tests and to determine its limitations." Harris also averred that the "DEA, through its scientific working group SWGDRUG, has written a comprehensive guide to validation."

[14] *See Motorola Inc. v. Murray*, 147 A.3d 751, 757 & n.8 (D.C. 2016) (en banc) (adopting Fed. R. Evid. 702 (d), which "expressly requires the court to determine whether [an] expert has reliably applied [accepted] principles and methods to the facts of the case" (internal quotation marks omitted)).

that a remand is required for the court to consider this category of documents more fully.

   c. Maintenance and calibration records.  We next consider appellant's claim that the trial court erred in not compelling the government to produce "maintenance and calibration records for the equipment used by the DEA lab." The trial court ruled that "[a]bsent a good-faith assertion of an equipment defect, defendant's request for calibration checks is overly broad and, therefore[,] denied." As to the request for maintenance information, the trial court denied the request "as unduly burdensome" and noted that the government was obligated under *Brady v. Maryland*, 373 U.S. 83 (1963), "to furnish defendant with information regarding problems with the equipment employed here." Harris's third affidavit averred that "[e]very time a GC/MS is used for casework, a tune and calibration must be performed to allow the instrument to 'calibrate' and then to provide an assessment of the state of the instrument prior to running unknown samples."  She added that "maintenance and calibration logs . . . should detail the performance of the instrument and the laboratory's adherence to a maintenance procedure."  In her second affidavit, however, Harris averred that "[w]ith regard to the GC/MS, which is identifying THC rather than marijuana, false positives are rare due to the unique

action of the mass spectrometer" (although "[s]ample contamination and misinterpretation of data . . . can lead to false positive results").

On this record — Harris's statement about maintenance and calibration only with respect to the GC/MS equipment — we must agree that appellant's request to compel production of "maintenance and calibration records for the equipment used by the DEA lab" (without restriction as to time period or as to type of equipment) was overly broad. Further, as Harris did not state that failure to calibrate the GC/MS equipment could lead to a false positive identification of marijuana, it is not apparent from the record that the documents sought were relevant to whether appellant "committed the crime charged," *Armstrong*, 517 U.S. at 462, or that they would have enabled appellant "significantly to alter the quantum of proof in his favor." *Jordan*, 316 F.3d at 1251.[15] Nevertheless, the trial court's reasons for

---

[15] Quoting the Court of Appeals of Maryland's opinion in *Cole*, appellant argues that it is enough that the requested calibration records are "potentially relevant to the case because an improperly calibrated machine . . . could lead to an inaccurate result." 835 A.2d at 614. Our case law does not allow this approach in light of the record of government document production in this case. *See Jackson*, 768 A.2d at 584 & n.2 (acknowledging that Rule 16 "looks only to the potential value of the evidence to competent defense counsel," but explaining that the "higher" materiality standard established by *Curtis* applies where the government has already produced documents showing the "underlying spectral analysis of the drugs" and describing the DEA's "test procedures and equipment," and the defense nonetheless is "demanding still additional background documents related to DEA testing" (internal quotation marks and brackets omitted)). We also note that *Cole*

(continued…)

denying the motion to compel the production of maintenance and calibration records even for the GC/MS equipment that Harris discussed — that the request was unduly burdensome and that *Brady* required the government to produce information about problems with the equipment — either are unsupported (and contradicted by Harris's sworn statement about the minimal burden of production) or do not take into account the relevance of information about (possible) lack of adherence to a maintenance or calibration regimen. Thus, we cannot uphold the trial court's ruling with respect to maintenance and calibration records for the GC/MS equipment used in this case.

d. <u>Audit reports.</u> The trial court rejected appellant's request to compel production of "audit reports on the operations of the DEA lab" as "unduly burdensome" (noting, as to this category, too, that *Brady* "obligates the government to disclose any problems with the accuracy of tests that may have been

---

(…continued)
did not interpret a rule of criminal procedure analogous to our Rule 16 (a)(1)(E); rather, it applied Maryland law that establishes a relevance standard (rather than our jurisdiction's "materiality" standard). *Compare Curtis*, 755 A.2d at 1014–15 (holding that what is required to establish materiality under the rule currently codified as Rule 16 (a)(1)(E) is "some preliminary showing of a reason to doubt the chemical analysis provided by the government"), *with Cole*, 835 A.2d at 608 (explaining that "to show a given document or item of information is discoverable, a defendant must show . . . that the information or document is relevant to the subject matter of the case").

revealed as a result of any audits"). Yet, Harris's third affidavit averred that the burden associated with producing the audit reports is minimal, explaining that such reports "are required to be . . . stored in easily accessible locations in order to maintain accreditation," and the government put forth no evidence of its own to dispute Harris's assertion. Appellant's specific request — for "any audit reports for the period beginning one year prior to the testing performed in" this case — may, however, be overly broad, since it appears to seek documents covering a time period other than the one during which DEA chemist Edwards performed her analysis in connection with appellant's case. On remand, the trial court should reconsider the request for audit reports that are temporally relevant.

e. Proficiency examinations and performance evaluations. The final category of documents in dispute pertains to "proficiency examinations and performance evaluations for the chemist who . . . tested the suspected marijuana." In denying appellant's request to compel production, the trial court reasoned that disclosure was not mandated "[g]iven the applicability of the Privacy Act [5 U.S.C. § 552a (2012)]." Appellant argues that such denial was an abuse of discretion because "courts have unanimously held that the Privacy Act does not create a discovery privilege." We agree with appellant that the trial court's rationale reflected an erroneous legal interpretation and was not a sufficient basis for

denying his request. *See In re Tucker*, 689 A.2d 1214, 1215–16 (D.C. 1997) (recognizing that the Privacy Act allows for the disclosure of information otherwise protected by the Act "pursuant to the order of a court of competent jurisdiction," and concluding that this term includes "the court with jurisdiction over the substantive controversy," which therefore "has jurisdiction to determine whether disclosure of the records in question should be required" (internal quotation marks omitted)).

In *Laxalt v. McClatchy*, the United States Court of Appeals for the District of Columbia Circuit held that the district court "applied the wrong legal standard" when it required appellants to show "a specific need for [] documents" that they requested in (civil) discovery and that were subject to the Privacy Act. 809 F.2d 885, 886 (D.C. Cir. 1987) (internal quotation marks omitted). The court reasoned that the Privacy Act "does not create a qualified discovery privilege" and does not "create any other kind of privilege or bar that requires a party to show actual need as a prerequisite to invoking discovery." *Id.* at 888. Rather, "the plain language of the statute permits disclosure 'pursuant to the order of a court of competent jurisdiction.'" *Id.* (citing 5 U.S.C. § 552a (b)(11) (1982)). The court found "no basis for inferring that the statute replaces the usual discovery standards . . . with a different and higher standard" and held that "a party can invoke discovery of

materials protected by the Privacy Act through the normal discovery process and according to the usual discovery standards." *Id.* at 888–89; *see also id.* at 889 (noting that the fact that a document is subject to the Privacy Act may be relevant "to the manner in which discovery should proceed" and that the district court had "ample discretion to fashion [an] appropriate protective order[] upon a showing of 'good cause'" (citation omitted)).

In the instant case, the trial court erroneously relied solely on a more restrictive application of the Privacy Act. We conclude that the DEA chemist's proficiency testing results and performance evaluations (which bear on the DEA chemist's competence to perform the drug testing and trustworthiness in accurately reporting test results) were material to appellant's defense and that the trial court's ruling denying appellant's request to compel productions of these items solely on the basis of the Privacy Act, and without consideration of a protective order, cannot be sustained.[16]

---

[16] The government argues that the documents were not material because the government was obligated under *Giglio v. United States*, 405 U.S. 150 (1972), to disclose any proficiency-examination failures and negative performance evaluations. As appellant argues, however, that obligation at least arguably would not require the government to produce passing but low-proficiency examination results, and adherence to its obligations under *Giglio* presumably would not require the government to disclose, e.g., that, at the time she performed her analysis, the chemist had not been tested recently.

**IV.**

The remaining issue is whether appellant was prejudiced by the denial of his motion to compel. As noted above, our task is to "determine the likelihood that the verdict would have been different had the government complied with the discovery rules." *Ferguson*, 866 A.2d at 65 (internal quotation marks omitted). If we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," or if we are "left in grave doubt, the conviction cannot stand." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

We have considered whether the issue of prejudice (from appellant's lack of access to documents that might have enabled him to create doubt about whether the plant-like substance was marijuana) is resolved by the fact that several times — during his opening statement and closing argument — appellant's trial counsel referred to the substance as marijuana. As the government asserts, appellant "did not contest at trial that the substance found inside the bag was marijuana." Quite the contrary, in his opening statement, appellant's counsel stated, "These officers found a bag that *had marijuana in it*[,] and they assumed that it belonged to Mr.

Buchanan" (emphasis added), and in his closing argument told the court that appellant was "not contesting that whoever possessed that bag . . . and that marijuana would be guilty of these crimes" and argued that the case was about officers "jumping to conclusions" when they "found this marijuana[] [and] . . . assumed it belonged to Mr. Buchanan." We have said that such references may be "tantamount to, or indeed constitute[], evidentiary admissions" that are "binding upon the party." *Kaliku v. United States*, 994 A.2d 765, 777 (D.C. 2010) (internal quotation marks omitted) (stating that counsel's repeated statements, during opening and closing, that their clients engaged in consensual sexual acts with the victim constituted evidentiary admissions that rendered harmless the government's failure to produce for cross-examination the FBI analyst who performed the testing that concluded that the victim's DNA was found on defendants' penile swabs).

We decline to decide the appeal on this basis, however. We recognize that counsel's approach, like his decision to forgo cross-examination of the DEA chemist, may have reflected his assessment that a challenge to whether the plant-like substance was marijuana was not "worth the candle" in light of the trial court's denial of the defense motion to compel documents that might have been used to undermine the results reported on the DEA-7. *Jackson*, 768 A.2d at 584.

The government argues that appellant's "stipulat[ion] to the chemist's report and analysis" forecloses his argument that he was prejudiced by the court's discovery ruling. We agree that the stipulation may be taken as a concession that the DEA chemist's report was sufficiently reliable to be admissible,[17] but we reject the notion that the stipulation now precludes appellant from arguing that he was entitled to discovery that may have enabled him to persuade the fact-finder that there was a reason to doubt the DEA-7 results. *Cf. Byrd v. United States*, 485 A.2d 947, 950 (D.C. 1984) ("[T]he defense was not foreclosed from calling witnesses in contradiction" of stipulated testimony); *see also* Criminal Jury Instructions for the District of Columbia, No. 2.104 cmt. (5th ed. rev. 2012) ("When the parties agree that stipulated testimony or deposition testimony is admitted, the parties are still free to challenge that evidence in the same manner as they would live testimony.").

As discussed above, through the DEA chemist's report, the government presented evidence that the chemist performed three tests whose results led her to conclude that the plant-like substance was marijuana: microscopic examination, the D-L test, and the GC/MS test. We agree with the government that the

---

[17] *See Minor v. United States*, 57 A.3d 406, 421 n.11 (D.C. 2012) (recognizing that expert testimony must be sufficiently reliable to be admissible). Appellant acknowledges that he "stipulated to the *admissibility* of the government's drug analysis."

consistent positive results on each of the tests employed strengthened the government's evidence and weighs against a reason to doubt.[18] We also note that the government produced a photograph of the color results of the D-L test, and appellant's expert did not suggest that the DEA chemist made an interpretation error with respect to those results. However, Harris's affidavits informed the court that the results of each of these tests are "susceptible to error" and have "an associated degree of uncertainty." Specifically, Harris averred that "other plant species unrelated to marijuana share similar morphological characteristics" on microscopic review; that the D-L test is expected to sometimes yield false positives, both because it is a screening test and because the analysts must interpret the colors the test produces; and that false positive results can be obtained on the GC/MS test because of sample contamination or "[i]ncorrect or overreaching data interpretation." In addition, as discussed above, from her review of the DEA chemist's worksheets, Harris observed that the chemist "used the remaining portion of another test sample to conduct [the D-L test and that this] is not proper

---

[18] The substance also field-tested positive for THC. While a field test "is not dispositive" and, "standing alone, cannot prove [the nature of the substance] beyond a reasonable doubt," it "does constitute evidence of the identity of the seized substance" and can be considered in a determination of whether the government's evidence "was overwhelming." *Digsby v. United States*, 981 A.2d 598, 605–06 (D.C. 2009) (internal quotation marks and brackets omitted).

scientific practice and could result in contamination of the sample prior to the D-L test."

In light of the deviation from "proper scientific practice" Harris alleged, the potential for error she identified in each set of test results, and the government's failure to produce any documents within the categories discussed above — documents that may bear on the likelihood that the chemist performed her analysis in a reliable way — we are unable to assess whether appellant was prejudiced by the lack of access to documents he was entitled to access under Rule 16 (a)(1)(E).[19]

---

[19] We are mindful of the government's assertion (and of the trial court's comments highlighting) that the defense forwent opportunities to challenge the government's forensic evidence by, for example, calling Harris to testify at trial or engaging a chemist to test the suspected marijuana. But, of course, appellant had a "constitutional right to put the government to its proof and not put on a defense . . . ." *Thomas v. United States*, 914 A.2d 1, 16 (D.C. 2006). Moreover, we are reluctant to decide the issue before us — whether appellant was entitled to discovery under Rule 16 (a)(1)(E) — on the basis of whether appellant utilized opportunities that could have implicated his privilege against self-incrimination by requiring him to disclose information that "might work to his disadvantage." Fed. R. Crim. P. 16 advisory committee's note to 1974 amendments (including amendments that gave "greater discovery to . . . the prosecution"); *see also* Fed. R. Crim. P. 16 (b)(1)(B) (providing that "[i]f a defendant requests disclosure [of any report of a scientific test] under Rule 16 (a)(1)(F) and the government complies, the defendant must permit the government, upon request, to inspect and to copy or photograph the results or reports of any . . . scientific test or experiment [within the defendant's possession, custody, or control] if . . . the defendant intends to use the item in the defendant's case-in-chief at trial, or intends to call the witness who prepared the report and the report relates to the witness's testimony").

(continued…)

Without the SOPs, training and proficiency/performance materials, validation studies and temporally relevant audit report(s), and maintenance and calibration logs for the GC/MS equipment used in this case, we cannot say whether the possible flaw Harris identified was significant enough "to call in question the government's proof of the identity of the substances analyzed," *Jackson*, 768 A.2d at 584, or whether the impact "possibly could be great enough to be helpful to appellant," *Young v. United States*, 63 A.3d 1033, 1056 (D.C. 2013). "The assistance of the trial court [in evaluating prejudice *vel non*] is therefore necessary." *Jackson*, 768 A.2d at 584.

## V.

For the foregoing reasons, we remand the record to the trial court with instructions that (1) the trial court is to reconsider its ruling with respect to the validation studies, maintenance and calibration records for the GC/MS equipment used in this case, and audit reports; (2) the government is to produce, for inspection by the court and the defense, any documents falling within those categories the

---

(…continued)
Accordingly, the forgone opportunities the government highlights do not enter into our analysis of prejudice.

trial court decides must be produced after reconsidering its ruling, as well as the DEA laboratory SOPs and training materials and the DEA chemist's proficiency examination results and performance evaluations whose production appellant sought to compel; and (3) after such further proceeding as it deems appropriate, the trial court is to make findings relevant to this court's ultimate decision as to whether the erroneous nondisclosure was prejudicial.[20] This court will, of course, after briefing by the parties, "have [the] . . . last word as to whether or not to sustain [appellant's] conviction that follow[ed] a trial marred by [the discovery-ruling] . . . error[s]" described above.  *Davis*, 564 A.2d at 33-34.

*So ordered.*

---

[20] The record of the remand proceedings shall be certified by the Clerk of the Superior Court to the Clerk of this court.